IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE: AFLIBERCEPT PATENT
LITIGATION

MDL NO. 1:24-MD-3103-TSK

THIS DOCUMENT RELATES TO
CASE NO. 1:23-CV-89

** SEALED **

<u>ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION</u>

Pending before the Court is Plaintiff Regeneron's Motion for Preliminary Injunction [ECF Nos. 108, 131[1]].  The motion is fully briefed and ripe for decision.  For the reasons set forth herein, the motion is **GRANTED**.

## I. PRELIMINARY STATEMENT

Plaintiff Regeneron Pharmaceuticals, Inc. ("Regeneron") filed this patent infringement action.  Therein, at issue in the preliminary injunction is one of those patents: U.S. Patent No. 11,084,865 (the "Product Patent").  The asserted patent claims are associated with Regeneron's product Eylea® and Celltrion's filing of an abbreviated Biologics License Application ("aBLA") seeking to commercially manufacture, use, import, offer to sell, and/or sell "CT-P42," a biosimilar version of Eylea.

---

[1] All docket references are to member case 1:23-CV-89 unless otherwise indicated.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

## II.   FACTUAL BACKGROUND

### 1. Regeneron's Eylea Product

Regeneron invented and developed Eylea, which the U.S. Food and Drug Administration ("FDA") approved on November 18, 2011. The Court has previously addressed the pertinent background and development of Eylea.  See Regeneron Pharm., Inc. v. Mylan Pharm. Inc., --- F. Supp. 3d ---, 2024 WL 382495, at \*13-14 (N.D.W. Va. Jan. 31, 2024) ("Mylan") (discussing relevant background of Eylea). "Eylea is an ophthalmic drug product invented by Regeneron scientists that has been used to treat millions of patients suffering from diseases that can cause vision loss or even blindness." Id. at \*13.  The active ingredient in Eylea is the fusion protein now referred to as aflibercept.  Aflibercept was initially developed as a cancer therapeutic and Regeneron later discovered that aflibercept could be used to treat angiogenic eye diseases—eye diseases caused by uncontrolled blood vessel growth in the retina—through intravitreal injections (injection into the vitreous of the eye). Id. at \*13-14.

After more than a decade of development and multiple clinical trials, Regeneron achieved an Eylea formulation that improved on the leading treatment for one angiogenic disease—wet Age-Related Macular Degeneration ("AMD"). Id. at \*13 (quoting Trial Tr.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

172:16-24 (Yancopoulos)). The Eylea formulation contains 40 mg/ml aflibercept, 10 mM sodium phosphate, 40 mM sodium chloride, 0.03% polysorbate 20, and 5% sucrose, pH 6.2. Id. at *14. Following its initial FDA approval, Regeneron tested Eylea effectiveness in patients with other angiogenic eye disorders, ultimately obtaining approval for Eylea's use to treat those conditions as well. Id. Soon, Eylea "became the new gold standard of care" for treating such eye disorders. Mylan Trial Tr. at 172:19-20 (ECF No. 108-27, Sheridan Ex. 51).

Following the success of Regeneron's Eylea vial formulation, Regeneron developed and obtained approval in November 2011 for Eylea in a pre-filled syringe ("PFS"). See Sheridan Decl. ¶ 48 (ECF No. 108-21). Then in August 2023, Regeneron received approval to sell Eylea HD, an 8 mg formulation that requires less frequent injections and provides improved anatomical outcomes in the form of drier retinas. Id.; Clark Decl. ¶ 3 (ECF No. 108-34). Eylea HD is currently approved to treat wet AMD, Diabetic Macular Edema ("DME"), and Diabetic Retinopathy ("DR"). Clark Decl. ¶ 3.

### 2. Other Anti-VEGF Treatments

For the past five years, Eylea has maintained its place as the "category leader" in anti-VEGF treatments, ███████ ██

████████████████████████████    ███████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

██████████████████████ ████████████████ The second most popular anti-VEGF agent, Avastin (bevacizumab), ████████████ ████████████████████ ████████████████ Avastin is an oncology drug for metastatic colorectal cancer (among other cancers), but ophthalmologists sometimes use it off-label (i.e., for diseases for which it does not have FDA approval) to treat angiogenic eye disorders. Sheridan Decl. ¶ 55 (ECF No. 108-21). The third- and fourth-most popular anti-VEGF agents, Vabysmo (faricimab) and Lucentis (ranibizumab), are approved to treat angiogenic eye disorders. Id. ¶¶ 57-59. Genentech manufactures all three drugs. Id. ¶¶ 55, 57-59.

Eylea, Avastin, Vabysmo, and Lucentis make up more than ██ of anti-VEGF ophthalmic sales. Clark Decl. ¶ 6; Clark Ex. 1 at 3-4. Other products on the market—such as Beovu are prescribed less frequently. Regeneron Pharms., Inc. v. Mylan Pharms., Inc., C.A. No. 1:22-cv-61, ECF No. 571 (Trial Tr.) at 861:6-862:4 (Albini). Overall, Eylea has maintained its category leadership due to its safety, efficacy, and dosing regimen advantage. Clark Decl. ¶ 7.

### 3. Aflibercept Biosimilars

At least nine pharmaceutical companies are developing and seeking FDA approval for aflibercept biosimilars, each of which contains the same active ingredient as Eylea, also in a 2 mg vial

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

and in some cases PFS formulation.  Sheridan Decl. ¶ 49.  Absent

injunctive relief, Regeneron expects ████████████████████████████

████████████████████████████████████████████████     ████

### 4. Celltrion's aBLA and Proposed Biosimilar Product

Celltrion is a Korean biopharmaceutical company headquartered

in Incheon, South Korea and is focused on the development of

biosimilars to previously licensed "reference products" like

Regeneron's Eylea® product.  Shin Decl. ¶¶ 2-3 (ECF No. 68-1).  On

June 30, 2023, Celltrion filed aBLA No. 761377 ("Celltrion's aBLA")

with FDA seeking approval under the Biologics Price Competition

and Innovation Act ("BPCIA"), 42 U.S.C. §§ 262(k)-(l), to market

and distribute its biosimilar of Eylea, "CT-P42," throughout the

United States, including in West Virginia.  Shin Decl. ¶¶ 4, 9.



Celltrion's aBLA specifies ████████████████████████████████

████  ██████████   ████████████   ██████████   ████   ████████████

---

[2] CT-P42 is supplied in two presentations: a vial as part of a vial
kit and a pre-filled syringe.  Trout Decl. App. A ¶¶ 1, 10, 109
(ECF No. 108-4).

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

_____ Trout Decl. App. A ¶ 11 (ECF No. 108-4), and is

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ Id. ¶ 16 (internal quotations

omitted); Trout Ex. C-2 (ECF No. 108-5). Celltrion's aBLA also

specifies the composition of CT-P42. ██████████████████

█████████████████ █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████ Trout Decl. App. A ¶¶ 2-3.

Celltrion's aBLA also includes a proposed label to be packaged

along with the marketed CT-P42 product. See Trout Decl. App. A

¶¶ 12, 111; Trout Ex. C-2. Like the Eylea label, Celltrion's

proposed label recommends that doctors use CT-P42 to treat wet

AMD, Macular Edema Following Retinal Vein Occlusion ("RVO"), DME,

and DR. Trout Decl. App. A ¶ 12; Trout Ex. C-2.

In connection with Celltrion's aBLA request for FDA approval

to market CT-P42 in the United States, ██████████████████

████████████████████████████████ ████████████████

██████████████ ██████████████████ Celltrion and a U.S. company

called Celltrion USA, Inc. ("Celltrion USA") entered into a Master

Product Supply Agreement to market, promote, distribute, sell, and

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

otherwise commercialize CT-P42 in the U.S., among other countries.

███████████████████████████████████████████████

███ ██ ████ ███████ ███ ███ ████ ████ ████ ████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ ████████████████████████

██████████████████████████████████████████████

███ ███████ ██████ ████ ███████ ████ ███ ███ ████

██ ███ ██ ████ ██████ ███ █ ███ ██ ███

████████████ ███████ ████████ ███████ ███

██ ████ ██ ███ ███ ████ ██ ████ ██████

█████████████ ████ █████ ████ █████ ██

███████████

           ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████ ██████ █████ ████████ ██ █ ███

████ ████ ████ ████ ██████ ██ █████ ██

██████████████████████████████████████████████

█████ █████████████████████████████████████████

██           Celltrion does not deny that, through Celltrion USA,

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

Celltrion will market, sell, and distribute CT-P42 in West Virginia. ████████████████████████████████████████

████████████████████████  ███████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████

### III.  PROCEDURAL HISTORY

Pursuant to 42 U.S.C. § 262(l)(8)(A), an applicant must provide notice to the reference product sponsor no later than 180 days before the date of the first commercial marketing of the applicant's product. ████████████████████ Celltrion transmitted its Notice of Commercial Marketing ("NCM") to Regeneron, ████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████  ██████████
███  ███  ███  ██████  ██████  █████  █████  ██  ████
████████████████████████████████████████████
████████████████████████████████████████████

████  ███  Subsequently, Regeneron filed this lawsuit against Celltrion on November 8, 2023, asserting that Celltrion's proposed

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

CT-P42 product would infringe at least 38 of its patents.  ECF No. 1.

On December 28, 2023, Regeneron filed an emergency motion requesting either a schedule for preliminary injunction proceedings or an emergency status conference.  ECF No. 45.

Following the Scheduling Conference in this matter on January 5, 2024, the Court issued an Order Setting the Briefing Schedule on Motions to Dismiss and Setting the Schedule for Preliminary Injunction Proceedings ("Scheduling Order").  ECF No. 61.  The Scheduling Order required Regeneron to identify no more than eight patents that may be included in a motion for preliminary injunction.  Id. at 3.  On January 11, 2024 and pursuant to the Scheduling Order, Regeneron provided Celltrion a narrowed list of patents that may be included in a motion for preliminary injunction, see ECF No. 65, and on February 2, 2024, Regeneron further narrowed that list of patents that may be included in a motion for preliminary injunction, see ECF No. 93.

On January 17, 2024, Celltrion filed a motion to dismiss for lack of personal jurisdiction or alternatively to transfer venue. ECF No. 68.  Regeneron filed its opposition to that motion on February 19, 2024, ECF No. 104, and Celltrion filed a reply on February 26, 2024, ECF No. 114.

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to the Court's Scheduling Order, Regeneron filed a motion for preliminary injunction against Celltrion on February 22, 2024, based on the Product Patent and U.S. Patent 11,793,926 (the "Sterile Barrier Patent"). ECF No. 108. Regeneron presumably did so because, pursuant to 42 U.S.C. § 262(k)(7)(A), approval of Celltrion's aBLA may be made effective 180 days after the service of Celltrion's NCM and as soon as Eylea's regulatory exclusivity expires on May 18, 2024. Id. Regeneron's motion asserted claims 4, 7, 9, 11, and 14-17 ("Asserted Product Patent Vial Claims") and claims 29, 32, 34, 36, and 39-42 ("Asserted Product Patent PFS Claims") of the Product Patent (collectively, the "Asserted Product Patent Claims") and claims 11-14 and 16-20 of the Sterile Barrier Patent ("Asserted Sterile Barrier Patent Claims"). Id. On March 7, 2024, Regeneron filed a supplemental motion for preliminary injunction as to claim 42 of the Product Patent in light of new data produced by Celltrion. Regeneron Suppl. PI Br. (ECF No. 129-2). Celltrion filed its opposition to Regeneron's PI motion on March 21, 2024, Opp. (ECF No. 143-2), and Regeneron filed a reply on April 18, 2024, Reply (ECF No. 157-2).

On May 15, 2024, the Court entered a stipulation under which Celltrion agreed to maintain the marketplace status quo and not launch its CT-P42 product before the Court denies Regeneron's

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

motion for preliminary injunction against Celltrion or ████████

████, whichever is earlier.  ECF No. 177.  On May 17, 2024, the

Court held a scheduling conference.  ECF No. 178.

    To streamline the issues in dispute in the Preliminary

Injunction motions, Regeneron moved to withdraw its Motions for

Preliminary Injunction with respect to the Sterile Barrier Patent

on May 21, 2024.  ECF No. 183.

    The Court has not held an evidentiary hearing on Regeneron's

motion for injunctive relief, and one is not necessary here.  The

Court originally scheduled a hearing on Regeneron's motion for May

2, 2024.  On April 23, 2024, the parties filed a joint motion

requesting "a status conference to discuss the logistics of the

injunction hearings scheduled for May 2, 2024, including the length

of the time of the hearings, and the Court's preferences for the

presentation of argument."  Joint Mot. for Status Conf. (MDL No.

1:24-md-3103, ECF No. No. 9).  The parties did not request or

otherwise discuss the presentation of testimony or other evidence

during the May 2 hearing in their April 23 submission.  Id.  On

April 24, 2024, the Court continued the May 2 hearing in view of

the multi-district litigation consolidation of this and several

related proceedings as well as the scheduling of a separate

criminal trial.  Order Continuing May 2, 2024 Preliminary and

IN RE: AFLIBERCEPT PATENT LITIGATION              1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Permanent Injunction Hearings (MDL No. 1:24MD3103, ECF No. 13).  On May 17, the Court held a status conference in which all parties appeared, and no party objected to the cancellation of the preliminary injunction hearing, sought its reinstatement,[3] or otherwise objected to proceeding on the papers.  To the extent any party now argues that a hearing was necessary, the Court finds that the parties waived request to a hearing.  See Baxter Healthcare Corp. v. Med. Lab'y Automation, Inc., 1994 WL 695521, at \*2 (N.D. Ill. Dec. 9, 1994) ("Baxter did not request an evidentiary hearing or suggest that an evidentiary hearing was needed or would be preferable. . . . A party that rests on affidavits and other written submissions waives an evidentiary hearing."); Sciele Pharma Inc. v. Lupin Ltd., 2012 WL 113004, at \*3 (D. Del. Jan. 12, 2012).  The Court thus resolves Regeneron's motion for a preliminary injunction based on the parties' written submissions and cited testimony.  See Richmond Tenants Org., Inc. v. Kemp, 956 F.2d 1300, 1304 (4th Cir. 1992) (affirming preliminary injunction where "the district court issued a

---

[3] Even a cursory review of the docket in this and the related cases reveals the parties are no stranger to motions practice. The lack of a motion to convene an evidentiary hearing is quite telling.

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

preliminary injunction prohibiting evictions without prior notice

and a hearing and enjoining defendants").

## IV.   FACTUAL BACKGROUND

### A. Declarants

Regeneron filed declarations from two expert witnesses, Dr.
Bernhardt Trout and Dr. Sean Sheridan, and two fact witnesses, Mr.
Kevin Clark and Dr. Kenneth Graham, in support of Regeneron's
preliminary injunction motion regarding the Product Patent.
Celltrion deposed three of Regeneron's witnesses but declined to
take the deposition of Dr. Kenneth Graham, a fact witness. See
Regeneron's Opp. to Celltrion's Mot. to Strike at 9-10 (ECF No.
166). Celltrion presented declarations from three expert
witnesses relevant to the Product Patent: Dr. Peter Tessier, Dr.
James Malackowski, and Dr. Christine Kay. Regeneron deposed all
Celltrion's witnesses.

### 1. Regeneron's Declarants

Dr. Bernhardt Trout, Ph.D., addressed the infringement and
validity of the Product Patent. Dr. Trout also provided expert
testimony about infringement and validity of the Product Patent at
the Mylan trial. Dr. Trout is a Professor of Chemical Engineering
at the Massachusetts Institute of Technology and holds a Ph.D. in
chemical engineering. Trout Decl. ¶¶ 16-17 (ECF No. 108-4). At

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

MIT, Dr. Trout performs pharmaceutical development and manufacturing research on biopharmaceutical (e.g., protein-based) therapeutics and has worked on approximately fifty biologic therapeutics. Id. ¶¶ 19-20.

Dr. Sean Sheridan is a Vice President at Charles River Associates, an international business consulting firm, and has a Ph.D. in genetics as well as an MBA with concentrations in finance and economics from the University of Chicago. Sheridan Decl. ¶¶ 1-2. Dr. Sheridan's declaration addressed whether Regeneron would be irreparably harmed by market entry of Eylea biosimilars prior to expiry of the asserted patents. Dr. Sheridan's previous experience has included the quantification of economic damages, and he has experience in modeling and valuation in a variety of intellectual property matters. Id. ¶¶ 3-5.

Kevin Clark is Vice President of Regeneron's Ophthalmology Commercial Business Unit, a role he has held since 2020. Clark Decl. ¶ 1. Mr. Clark's focus at Regeneron has been on the commercialization of Eylea and Eylea HD. Id. ¶ 3. Mr. Clark's declaration addressed the effect of biosimilar entry on Regeneron and its Eylea product.

Dr. Kenneth Graham, Ph.D., is a named inventor on the Product Patent. Dr. Graham has worked at Regeneron for over twenty-two

IN RE: AFLIBERCEPT PATENT LITIGATION                     1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

years and is currently the Executive Director of Formulation
Development at Regeneron.  Graham Decl. ¶ 1 (ECF No. 157-4).  He
joined Regeneron's Formulation Development group in 2005, when the
group was engaged in aflibercept formulation stability studies.
Id. ¶ 2.  Dr. Graham's declaration addresses several internal
stability studies Regeneron's scientists conducted on aflibercept.

### 2. Celltrion's Declarants

Celltrion filed an expert declaration from Peter M. Tessier,
Ph.D. addressing the validity of the Product Patent.  Dr. Tessier
is a Professor in the Departments of Pharmaceutical Sciences and
Chemical Engineering and Biomedical Engineering at the University
of Michigan and holds a Ph.D. in chemical engineering.  Tessier
Decl. ¶¶ 10-11 (ECF No. 142-5).  At the University of Michigan,
Dr. Tessier performs research on the formulation of biologics,
including research on formulations of protein-based biologics.
Id. ¶ 10.

Celltrion also filed an expert declaration from James
Malackowski addressing whether Regeneron would be irreparably
harmed by the launch of Celltrion's biosimilar product.  Mr.
Malackowski is the co-founder and Senior Managing Director of Ocean
Tomo, LLC, which provides consulting and financial expert services
related to clients' intellectual property.  Malackowski Decl. ¶ 1

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

(ECF No. 142-12).

Celltrion's third expert declaration was from Dr. Christine Kay, M.D.  Dr. Kay is a licensed ophthalmologist with experience in intravitreal injections, and has performed thousands of such injections over her career.  Kay Tr. 20:21-21:4 (ECF No. 157-3, Ex. 3).  Dr. Kay provided testimony regarding ophthalmologists' reasons for administering an ophthalmic drug product, which include the product's safety and efficacy.  ECF No. 142-22, Kay Decl. ¶¶ 39-47 (ECF No. 142-22).

**B. Product Patent**

The United States Patent and Trademark Office ("USPTO") issued the Product Patent, titled "VEGF Antagonist Formulations Suitable for Intravitreal Administration," on August 10, 2021, to Regeneron Pharmaceuticals, Inc. upon assignment from inventors Eric Furfine, Daniel Dix, Kenneth Graham, and Kelly Frye.  Product Patent, Cover Page (ECF No. 108-11, Trout Ex. 65).  The Product Patent claims priority through continuation and divisional applications to Provisional Patent Application No. 60/814,484, filed June 16, 2006.  Id.

This Court has previously addressed Regeneron's Eylea product and the Product Patent which Regeneron asserts in this preliminary injunction proceeding.  In Regeneron v. Mylan, this Court

16

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

previously held that the Product Patent was not invalid and that

Mylan's Eylea biosimilar, "M710," infringed claims 4, 7, 9, 11,

and 14-17 of the Product Patent. <u>Mylan</u>, 2024 WL 382495, at *25-

33, 46-70.

The following table lists the claims Regeneron contends that

Celltrion infringes, as well as the claims from which they depend.

Regeneron PI Br. at 5-8; Regeneron Suppl. PI Br. at 1.

| Claims of the Product Patent | |
|---|---|
| Claim 1 (<u>unasserted</u>) | 1. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises: a vascular endothelial growth factor (VEGF) antagonist an organic co-solvent, a buffer, and a stabilizing agent, wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography. |
| Claim 2 (<u>unasserted</u>) | 2. The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate. |
| Claim 4 | 4. The vial of claim 2, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20. |
| Claim 5 (<u>unasserted</u>) | 5. The vial of claim 2, wherein said organic co-solvent comprises 0.01% to 3% polysorbate 20. |

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

| Claim 7 | 7. The vial of claim 5, wherein said buffer comprises 5-25 mM buffer. |
| Claim 9 | 9. The vial of claim 5, wherein said buffer comprises a pH about 6.2-6.3. |
| Claim 10 (unasserted) | 10. The vial of claim 5, wherein said stabilizing agent comprises a sugar. |
| Claim 11 | 11. The vial of claim 10, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol. |
| Claim 14 | 14. The vial of claim 5, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4. |
| Claim 15 | 15. The vial of claim 5, wherein said formulation is capable of providing a turbidity of 0.01 or lower at OD405 after 2 month storage at 5° C. |
| Claim 16 | 16. The vial of claim 5, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography. |
| Claim 17 | 17. The vial of claim 5, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography. |
| Claim 26 (unasserted) | 26. A pre-filled syringe comprising an ophthalmic formulation suitable for intravitreal administration comprising: a vascular endothelial growth factor ( VEGF ) antagonist fusion protein, an organic co-solvent, a buffer, and |

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

| | |
|---|---|
| | a stabilizing agent;<br>wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and<br>wherein at least 98 % of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography. |
| Claim 27 (unasserted) | 27. The pre-filled syringe of claim 26, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co - solvent comprises polysorbate. |
| Claim 29 | 29. The pre-filled syringe of claim 27, wherein said organic co - solvent comprises about 0.03 % to about 0.1 % polysorbate 20. |
| Claim 30 (unasserted) | 30. The pre - filled syringe of claim 27, wherein said organic co-solvent comprises 0.01 % to 3 % polysorbate 20. |
| Claim 32 | 32. The pre-filled syringe of claim 30, wherein said buffer comprises 5-25 mM buffer. |
| Claim 34 | 34. The pre-filled syringe of claim 30 , wherein said buffer comprises a pH about 6.2-6.3. |
| Claim 35 (unasserted) | 35. The pre-filled syringe of claim 30, wherein said stabilizing agent comprises a sugar. |
| Claim 36 | 36. The pre-filled syringe of claim 35, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol. |
| Claim 39 | 39. The pre-filled syringe of claim 30, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62 , 94 , 149 , 222 and 308 of SEQ ID NO:4. |
| Claim 40 | 40. The pre-filled syringe of claim 30 , wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C. |
| Claim 41 | 41. The pre-filled syringe of claim 30, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography. |

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

| Claim 42 | 42. The pre-filled syringe of claim 30, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography. |
|----------|------------------------------------------------------------------|

The meaning and validity of a patent are evaluated from the perspective of a Person of Ordinary Skill in the Art ("POSA"). Neither party has advanced a definition of the POSA at this stage of litigation and the definition does not seem to be an issue of dispute at this time. As such, the Court adopts the definition of the POSA in this case that it adopted in Mylan:

> [T]he POSA 'would be a professional with a master's degree at least in a relevant field, so a technical field directly relevant to formulations here.' Tr. 2092:6-17 (Trout); PDX-9.002 (explaining that the POSA 'would have held an advanced degree, such as a Master's in a biopharmaceutical science, or a related discipline, such as chemical engineering, and several years of experience in the development of biologics products. Alternatively, the POSA could have a Ph.D. in such discipline and less experience. The POSA may collaborate with others, including a medical doctor with experience treating ophthalmic diseases.').

Mylan, 2024 WL 382495, at *22-23.

**C. Prior Claim Constructions**

This Court already construed two claim terms in the earlier Mylan litigation. In Mylan, "[t]he Court construed 'organic co-solvent' to mean 'an organic substance added to the primary solvent to increase the solubility of the solute, here a VEGF

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

antagonist' . . . [and] construed 'native conformation' to mean 'the original intact form of the VEGF antagonist, which is a form that does not exhibit chemical or physical instability.'" Mylan, 2024 WL 382495, at *17 (quoting Mylan, C.A. No. 1:22-cv-61, ECF No. 427 at 20, 25-26).   The parties have applied those constructions in these preliminary injunction proceedings, and the Court applies those constructions here as well.

   **D. Infringement**

   As detailed below, the Court finds that Celltrion's CT-P42 product meets each and every limitation of the Asserted Product Patent Claims; thus, Regeneron is likely to succeed on infringement of the Asserted Product Patent Claims.

   Only Regeneron submitted an expert declaration on the topic of infringement of the Asserted Product Patent Claims.  Regeneron's expert, Dr. Trout, explained that CT-P42 infringes all of the Asserted Product Patent Claims.  Trout Decl. App. A.  Celltrion did not dispute infringement or submit a declaration from a non-infringement expert.   Thus, Dr. Trout's infringement opinion remains unrebutted, and all limitations are undisputed between the parties.  As explained below, the Court credits the opinions of Dr. Trout on issues involving infringement of the Asserted Product Patent Claims.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

**E. Validity**

Celltrion raises two grounds of invalidity with respect to the Product Patent: obviousness-type double patenting and written description. Opp. at 6-17. Both parties submitted expert declarations addressing validity. Dr. Trout submitted an expert declaration for Regeneron, and Dr. Tessier submitted an expert declaration for Celltrion.

**F. Celltrion May Launch CT-P24 in the Absence of an Injunction**

Celltrion expects to receive FDA approval for CT-P42 by ████ ████. Sheridan Ex. C-3, at -764. (ECF No. 108-22). If that expectation holds, absent an injunction, Celltrion would be permitted to launch CT-P42 following the expiration on ████████ ████, of the stipulated temporary restraining order entered by this Court on May 14. ECF No. 177.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

See Malackowski Decl. ¶ 63; Opp. 22. Regeneron has sought a preliminary injunction to prevent Celltrion from producing, marketing, or selling their allegedly infringing product until after a decision after a trial on the merits.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

### G. CT-P42's Launch Will Irreparably Harm Regeneron

As detailed below, the Court finds that Celltrion's launch of CT-P42 will irreparably harm Regeneron. Regeneron's expert, Dr. Sheridan, submitted a declaration setting forth the anticipated harms that Regeneron would face if a biosimilar such as CT-P42 were to launch, including harm to market share, pricing, payor relationships, reputation, and research and development funding (which the Court does not find as a basis for irreparable harm here). The Vice President of Regeneron's Ophthalmology Commercial Business, Mr. Clark, also submitted a declaration detailing these anticipated harms. As explained below, the Court credits the opinions of Dr. Sheridan and testimony of Mr. Clark on issues involving irreparable harm.

Regeneron has demonstrated that it will suffer irreparable harm that a damages award could not fully remedy. A future damages award cannot compensate Regeneron adequately for the harm to its sales, price, relationships with payors and reputational harm. These harms, while nearly certain to occur, are all but impossible to fully quantify. They are also generally impossible to reverse. The Court will analyze each type of harm in detail below.

IN RE: AFLIBERCEPT PATENT LITIGATION                          1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

## V.  ANALYSIS

### A. Personal Jurisdiction

### 1. Regeneron's burden to establish a reasonable probability of success on the question of personal jurisdiction in the context of the Direct-File Defendants' jurisdictional challenges[4]

Generally speaking, a plaintiff need only make a prima facie showing of personal jurisdiction to survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(2).  Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989); United Coals, Inc. v. Attijariwafa Bank, No. 1:19-cv-95, 2022 WL 4715695, at *3 (N.D.W. Va. Sept. 30, 2022) (Kleeh, C.J.).  However, "a party cannot obtain injunctive relief against another without first obtaining in personam jurisdiction over that person."  R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 958 (4th Cir. 1999).  Accordingly, when a challenge to jurisdiction is interposed upon an application for a preliminary injunction, the plaintiff must establish that there is "a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits."  Catalog Mktg. Servs., Ltd. v. Savitch, No. 88-3538, 1989 WL 42488, at *2 (4th Cir. Apr. 24, 1989)

---

[4] "Direct-File Defendants" refers to those defendants against whom Regeneron filed suit in this Court — i.e., Samsung Bioepis Co., Ltd.; Celltrion, Inc.; and Formycon AG — and who have challenged the Court's exercise of personal jurisdiction by means of motions to dismiss for lack of personal jurisdiction.

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

(quoting Visual Scis., Inc. v. Integrated Commc'ns, Inc., 660 F.2d 56, 58 (2d Cir. 1981)).  "Reasonable probability" is something "less than a preponderance of the evidence." Buckner v. Polk, 453 F.3d 195, 203 (4th Cir. 2006).

    2. **Legal framework for determining whether the Court may exercise personal jurisdiction over the Direct-File Defendants**

    Under Rule 4(k)(1)(A), a district court has personal jurisdiction over a defendant if the defendant "would be subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located" — here, West Virginia. See Acorda Therapeutics Inc. v. Mylan Pharma. Inc., 817 F.3d 755, 759 (Fed. Cir. 2016) ("Acorda").  Because the West Virginia long-arm statute, W. Va. Code § 56-3-33, is coextensive with the full reach of due process, it is unnecessary to go through the traditional two-step process for determining the existence of personal jurisdiction. See Mey v. All Access Telecom, Inc., No. 5:19-cv-00237-JPB, 2021 WL 8892199, at *2 (N.D.W. Va. Apr. 23, 2021) (citing In re Celotex Corp., 124 F.3d 619, 627-28 (4th Cir. 1997)).  Instead, the statutory inquiry merges with the Constitutional inquiry, and the district court must determine whether exercising personal jurisdiction is consistent with the Due Process Clause. Id. at *2.

IN RE: AFLIBERCEPT PATENT LITIGATION                      1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

A court may exercise specific personal jurisdiction without violating the Due Process Clause where the defendant "'ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Acorda, 817 F.3d at 759 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). The Supreme Court has held that the minimum-contacts requirement is satisfied where the defendant "'purposefully directed'" activities at the forum "'and the litigation results from alleged injuries that arise out of or relate to those activities.'" Acorda, 817 F.3d at 759 (quoting Burger King v. Rudzewicz, 471 U.S. 462, 472-73 (1985)).

The Federal Circuit has held that "the minimum-contacts standard is satisfied" where a non-resident defendant files an abbreviated new drug application ("ANDA") "for the purpose of engaging in . . . allegedly wrongful marketing conduct in" the forum state. Id. at 760, 762-63; see also Valeant Pharms. N. Am. LLC v. Mylan Pharms. Inc., 978 F.3d 1374, 1384 (Fed. Cir. 2020) ("We held [in Acorda] that submission with an intent to distribute the generic product in a given state was sufficient for personal jurisdiction purposes."). The Federal Circuit further held that the minimum-contacts requirement is satisfied even where the defendant "does not sell its drugs directly into" the forum state

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

but rather contracts with a wholesaler or distributor to market
the drugs in the state. <u>Acorda</u>, 817 F.3d at 763.  The court
reasoned that the defendant had "taken the costly, significant
step" of applying to FDA for approval to market its generic drug
in the forum state and elsewhere and that this intent to market
was evidenced by distribution channels the defendant had
established — i.e., a "network of independent wholesalers and
distributors with which it [had] contract[ed] to market the drugs
in" the forum state and elsewhere.  <u>Id.</u> at 759-60, 763.

District courts have applied <u>Acorda</u> in the context of both
Hatch-Waxman and BPCIA cases.  <u>See, e.g.</u>, <u>AbbVie Inc. v. Alvotech
Hf.</u>, No. 21-c-2258, 2021 WL 3737733, at *12-13 (N.D. Ill. Aug. 23,
2021) (denying defendant/aBLA-filer's motion to dismiss for lack
of personal jurisdiction and rejecting defendant's argument that
<u>Acorda</u> did not govern because defendant itself did not "sign" the
aBLA); <u>Apicore US LLC v. Beloteca, Inc.</u>, No. 2:19-CV-00077-JRG,
2019 WL 1746079, at *3-4 (E.D. Tex. Apr. 18, 2019) (denying motion
to dismiss for lack of personal jurisdiction where defendant filed
ANDA to market generic drug throughout the United States, even
though defendant was "not licensed to do business in Texas, [did]
not have a registered agent in Texas, [did] not have a Texas
Taxpayer Number, [was] not licensed as a distributor of

## ** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

prescription drugs sold in Texas," and had entered into an agreement with a Delaware company headquartered in Florida to market, sell, and distribute the generic drug throughout the United States, on the grounds that defendant's "ANDA filing and approval—in combination with its intent to market, distribute, and sell the [accused product] through [the distributor's] established distribution network, which includes Texas—constitute sufficient minimum contacts with Texas"); Helsinn Healthcare S.A. v. Hospira, Inc., No. 15-cv-2077, 2016 WL 1338601, at *6-7 (D.N.J. Apr. 5, 2016) (denying motion to dismiss for lack of personal jurisdiction where defendant filed an ANDA to market generic drug throughout the United States, stating that "[t]he facts in Acorda bear a strong similarity to this action," including the fact that defendant would utilize a distributor to market, sell, and distribute the generic in the United States).

3. **Regeneron Has Established That It Has At Least a Reasonable Probability of Success on the Question of Jurisdiction When the Celltrion Action Is Tried on the Merits**

The relevant allegations of Regeneron's complaint and the Parties' motion papers, legal memoranda, and supporting affidavits demonstrate that Celltrion has filed an aBLA with the intent to distribute CT-P42 in West Virginia. Celltrion, the sole submitter

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

of its aBLA, has "taken the costly, significant step" of applying
to the FDA for approval to market, sell, and distribute CT-P42 in
the United States, which includes West Virginia. Acorda, 817 F.3d
at 759. Celltrion has served an NCM (ECF No. 104-4) which
explicitly communicates its intent to market CT-P42 in the United
States upon FDA approval of its aBLA. And Celltrion has not
disputed Regeneron's allegation that Celltrion intends, either
directly or indirectly (i.e., through a distributor), to market,
sell, and distribute FYB203 in West Virginia. See Compl. ¶ 17.
On the contrary, Celltrion has admitted that Celltrion USA, its
distributor, "will . . . market[], advertis[e], offer[] to sell,
sell[], and distribut[e] CT-P42 in the United States." Shin Decl.
¶ 9. These facts alone establish at least a reasonable probability
of success on the question of jurisdiction under Acorda. See
Acorda, 817 F.3d at 760, 762-63; see also Valeant, 978 F.3d at
1384.[5]

Documents produced by Celltrion during discovery further
indicate Celltrion's intent to market, sell, and distribute CT-
P42 in West Virginia. ███████████████████████████████████

---

[5] Because these "factual allegations are not directly controverted,
[they] are taken as true for purposes of determining jurisdiction."
Nuance Commc'ns, Inc. v. Abbyy Software House, 626 F.3d 1222, 1231
(Fed. Cir. 2010).

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**



Celltrion, for its part, protests that the Court may not exercise personal jurisdiction over it because Celltrion, itself, will not market, sell, or distribute CT-P42 in West Virginia; rather, Celltrion USA will. MTD at 3, 4, 10. But the Federal Circuit in Acorda precluded such an argument when it held that minimum contacts exist where a non-resident defendant has "a network of independent wholesalers and distributors with which it contracts to market [its] drugs in" the forum state. Acorda, 817

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

F.3d at 763 ("Such directing of sales into [the forum state] is
sufficient for minimum contacts."). Celltrion attempts to
distinguish Acorda by pointing out that, in that case, non-resident
defendant Mylan Pharmaceuticals had registered to do business in
the forum state, appointed an agent for service of process in the
forum state, and indicated in its certificate of registration that
it intended to engage in manufacturing, distribution, and sales in
the forum state. MTD at 11-12 (citing id.). These, however, were
not the facts upon which the Federal Circuit relied in determining
that the district court could exercise jurisdiction over Mylan.
Valeant Pharms. N. Am. LLC, 978 F.3d at 1384; Millennium Pharms.,
Inc. v. Pharmascience Inc., No. 15-702-GMS, 2016 WL 3382131, at *3
(D. Del. June 10, 2016) ("The Acorda court noted that Mylan was
incorporated in West Virginia, prepared its ANDA primarily in West
Virginia, and filed its ANDA in Maryland. . . . The court also
acknowledged that Mylan was registered to do business in
Delaware. . . . , however, the holding in the case was not based
upon these facts."). Instead, the Acorda court focused on Mylan's
ANDA submission and U.S. distribution channels — evidence of
Mylan's intent to market its drug in the forum state. Acorda, 817
F.3d at 760, 762-63; Valeant Pharms. N. Am. LLC, 978 F.3d at 1384;

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Millennium Pharms., Inc., 2016 WL 3382131, at *3.  As discussed above, such evidence exists here.

The Court therefore concludes that Regeneron has established at least a reasonable probability of ultimate success on the question of personal jurisdiction when the Celltrion action is tried on the merits and that it has authority to enter a preliminary injunction against Celltrion.

### B. Preliminary Injunction Standard

The Patent Act provides that in patent infringement cases, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283.

Indeed, patent owners have a constitutional and statutory grant to exclude others from one's property.  U.S. Const. art. I, § 8, cl. 8 ("by securing for limited times to . . . inventors the exclusive right to their respective . . . discoveries") (emphasis added); 35 U.S.C. § 154(a)(1) ("Every patent shall contain . . . a grant to the patentee . . . of the right to exclude others from making, using, offering for sale, or selling the invention . . . .") (emphasis added).  "[T]he axiomatic remedy for trespass on property rights is removal of the trespasser." Presidio Components v. Am. Tech. Ceramics, 702 F.3d 1351, 1362

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

(Fed. Cir. 2012).   A preliminary injunction thus "serve[s] to
prevent ongoing trespasses during the pendency of an infringement
case."  See BlephEx, LLC v. Myco Indus., Inc., 24 F.4th 1391, 1404
(Fed. Cir. 2022).

Issuance of a preliminary injunction depends on four factors:
whether (1) the plaintiff likely will succeed on the merits at
trial; (2) the plaintiff will be irreparably injured if an
injunction is not granted; (3) the balance of hardships favors the
plaintiff; and (4) the public interest will be furthered by an
injunction.  Winter v. NRDC, 555 U.S. 7, 20 (2008).  Here, each
factor favors entry of a preliminary injunction.

### C. Patent Law Framework

### A. Infringement

Under 35 U.S.C. § 271(e)(2), the filing of an aBLA with the
FDA "constitutes a technical" act of infringement.  Sunovion
Pharms., Inc. v. Teva Pharms. USA, Inc., 731 F.3d 1271, 1278 (Fed.
Cir. 2013); Amgen Inc. v. Apotex Inc., 712 F. App'x 985, 991-992
(Fed. Cir. 2017) (applying Sunovion to aBLA filing).  "[I]f a
product that an . . . applicant is asking the FDA to
approve . . . falls within the scope of an issued patent, a
judgment of infringement must necessarily ensue."  Sunovion
Pharm., Inc., 731 F.3d at 1278.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Regeneron, as the "patentee seeking relief under § 271(e)(2)[,] bears the burden of proving infringement by a preponderance of the evidence" at trial. Eli Lilly & Co. v. Teva Parenteral Medicines, Inc., 845 F.3d 1357, 1364 (Fed. Cir. 2017).

### B. Validity
### 1. Presumption of Validity

"A patent shall be presumed valid.  Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims." 35 U.S.C. § 282(a).  This presumption of validity "exists at every stage of the litigation," Canon Comput. Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998), including the preliminary injunction stage.  Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1377 (Fed. Cir. 2009).  Thus, if "the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." Canon Comput. Sys., 134 F.3d at 1088.

A patentee is never required to prove validity. See, e.g., Prometheus Labs., Inc. v. Roxane Labs., Inc., 805 F.3d 1092, 1101-02 (Fed. Cir. 2015) ("[A] patentee never must submit evidence to support . . . that a patent remains valid . . . ." (emphasis in

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

original) (quoting Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348,
1360 (Fed. Cir. 2007)); Ajinomoto Co. v. Archer-Daniels-Midland
Co., 1996 WL 621830, at *5 (D. Del. Oct. 21, 1996) ("It is not
necessary that the court hold a patent valid; it is only necessary
that it hold that the patent challenger has failed to carry its
burden.") (citing Jones v. Hardy, 727 F.2d 1524, 1529 n.3 (Fed.
Cir. 1984)), aff'd, 228 F.3d 1338 (Fed. Cir. 2000).

Pursuant to the statutory presumption of 35 U.S.C. § 282(a),
Defendants must prove invalidity at trial by clear and convincing
evidence. Microsoft Corp. v. i4i Ltd., 564 U.S. 91, 95 (2011).
Under the clear and convincing standard, a party alleging
invalidity must create "in the mind of the trier of fact 'an
abiding conviction that the truth of [the] factual contentions are
highly probable.'" Buildex Inc. v. Kason Indus., Inc., 849 F.2d
1461, 1463 (Fed. Cir. 1988) (quoting Colorado v. New Mexico, 467
U.S. 310, 316 (1984)).

"[T]he evidentiary burdens at the preliminary injunction
stage track the burdens at trial." Titan Tire, 566 F.3d at 1377;
Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal, 546
U.S. 418, 429-430 (2006) (rejecting argument that plaintiff
"should have borne the burden of disproving [affirmative defense]
at the hearing on the preliminary injunction"). However, the

35

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

patentee has the burden to "persuade the court that, despite the
challenge presented to validity, the patentee nevertheless is
likely to succeed at trial on the validity issue." Titan Tire,
566 F.3d at 1377.  The court "must determine whether it is more
likely than not that [Defendants] will be able to prove at trial,
by clear and convincing evidence, that the patent is invalid."
Id. at 1379.  In other words, after weighing the evidence for and
against validity available at the preliminary injunction stage,
the court must determine whether Defendants have raised a
"'substantial question' concerning the validity of the patent."
Id.

    "Substantial weight may be given to a patent's litigation
history in connection with a motion for relief pendente lite."
H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 388
(Fed. Cir. 1987), abrogated on other grounds, Markman v. Westview
Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc); Leeds
& Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 311 (1909)
("prior adjudications fortified the presumption of the validity of
the patent in suit, and established its scope" and affirming
preliminary injunction); see also, e.g., Fireball Gas Tank &
Illuminating Co. v. Com. Acetylene Co., 198 F. 650, 653 (8th Cir.
1912) ("It is an incontrovertible rule of equity jurisprudence

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

that where there has been a prior adjudication sustaining a patent . . . where the validity of the patent has been contested on full proofs, the Circuit Court should, upon a motion for a preliminary injunction, sustain the patent and leave the question of its validity to be determined upon the final hearing."), aff'd, 239 U.S. 156 (1915); Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1452-53 (Fed. Cir. 1988) ("[T]he patent holder may use a prior adjudication of patent validity involving a different defendant as evidence supporting its burden of proving likelihood of success on the merits."); Atlas Powder Co. v. Ireco Chem., 773 F.2d 1230, 1232 (Fed. Cir. 1985) (similar).

### 2. Obviousness-Type Double Patenting

Obviousness-type double patenting ("ODP") "is a judicially created doctrine" "that prevent[s] the extension of the term of a patent . . . by prohibiting the issuance of the claims in a second patent not patentably distinct from the claims of the first patent." Otsuka Pharm. Co. v. Sandoz, Inc., 678 F.3d 1280, 1297 (Fed. Cir. 2012) (internal quotation omitted). There are two steps to the ODP analysis. "First, the court construes the claims in the earlier patent and the claims in the later patent and determines the differences. Second, the court determines whether those differences render the claims patentably distinct." AbbVie

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Trust, 764 F.3d 1366, 1374 (Fed. Cir. 2014) (cleaned up).  In order for a claim in the later patent to be invalid for ODP, it must either be anticipated by or obvious over the claims in the earlier patent. Id.  ODP "turn[s] on a comparison between a patentee's earlier and later claims, with the earlier patent's written description considered only to the extent necessary to construe its claims." Eli Lilly & Co. v. Teva Parenteral Meds. Inc., 689 F.3d 1368, 1378-79 (Fed. Cir. 2012).  In other words, the challenger cannot rely on the teachings of the reference patent's specification to show that a particular limitation was known in the art.  Id.

For an earlier claim to anticipate a later claim, it must disclose "each and every limitation" of the later claim.  See Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1224 (Fed. Cir. 2014).  For an earlier claim to render a later claim obvious, "one of ordinary skill in the art would have had reason or motivation to modify the earlier claim[] to . . . the asserted claim with a reasonable expectation of success." Otsuka Pharm., 678 F.3d at 1298-99.  Further, with regards to obviousness, the party asserting ODP bears the burden to prove that the POSA as of the patent's priority date would have been motivated to modify the "reference claims" of the earlier patent to obtain the asserted

### ** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

claims with a reasonable expectation of success. Otsuka, 678 F.3d at 1298-99; Eli Lilly, 689 F.3d at 1378.

As in the obviousness context, objective evidence of nonobviousness must be considered. Eli Lilly, 689 F.3d at 1381. Evidence of an invention's unexpected properties and that others have copied the invention (among other evidence) can serve as such objective indicia in support of non-obviousness. See, e.g., WBIP LLC v. Kohler Co., 829 F.3d 1317, 1332-37 (Fed. Cir. 2016); Mintz v. Dietz & Watson, Inc., 679 F.3d 1372, 1379-80 (Fed. Cir. 2012). Likewise, "[e]vidence of industry skepticism weighs in favor of non-obviousness." WBIP, 829 F.3d at 1335 ("Doubt or disbelief by skilled artisans regarding the likely success of a combination or solution weighs against the notion that one would combine elements in references to achieve the claimed invention."). Objective indicia of nonobviousness also may consist of evidence that a prior art reference taught away from the claimed invention, i.e., that "person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." Millennium Pharms., Inc. v. Sandoz Inc., 862 F.3d 1356, 1366 (Fed. Cir. 2017) (quoting In re Urbanski, 809 F.3d 1237, 1244 (Fed. Cir. 2016)).

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

Such evidence can help to "guard against slipping into use of
hindsight" and "the temptation to read into the prior art the
teachings of the invention at issue." Apple Inc. v. Samsung Elecs.
Co., 839 F.3d 1034, 1052 (Fed. Cir. 2016) (en banc) (quoting Graham
v. John Deere Co., 383 U.S. 1, 36 (1966)); see also WBIP, 829 F.3d
at 1328 ("[O]bjective indicia of non-obviousness play an important
role as a guard against the statutorily proscribed hindsight
reasoning in the obviousness analysis.").

### 3. Inherency

An earlier claim that does not expressly disclose every
limitation of a later claim may still anticipate the later claim
if the missing limitation is inherent in the earlier claim. See
Allergan, Inc. v. Apotex Inc., 754 F.3d 952, 960 (Fed. Cir. 2014).
An inherent limitation must be "necessarily present" in the prior
art, id., and "may not be established by probabilities or
possibilities," PAR Pharm., Inc. v. TWI Pharms., Inc., 773 F.3d
1186, 1195 (Fed. Cir. 2012) (internal quotation omitted); Cont'l
Can Co. USA, Inc. v. Monsanto Co., 948 F.2d 1264, 1269 (Fed. Cir.
1991). It is of no matter if the missing limitation often or
usually would result from practice of the earlier claim — there is
no inherent anticipation unless the missing limitation is present
each and every time the earlier claim is practiced. See Glaxo

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

Inc. v. Novopharm Ltd., 52 F.3d 1043, 1047 (Fed. Cir. 1995)
(finding no inherent anticipation when the missing limitation was
present in thirteen out of fifteen examples of the earlier claim
being practiced).

In the obviousness context, the role of inherency is limited
because inherent properties may not have been understood by the
POSA and thus cannot support the POSA's motivation. As the Federal
Circuit has explained, "the use of inherency in the context of
obviousness must be carefully circumscribed because '[t]hat which
may be inherent is not necessarily known' and that which is unknown
cannot be obvious." Honeywell Int'l Inc. v. Mexichem Amanco
Holding, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (quoting In re
Rijckaert, 9 F.3d 1531, 1534 (Fed. Cir. 1993)).

### 4. Written Description

The written description requirement under 35 U.S.C. § 112
provides that a patent specification must "contain a written
description of the invention, and of the manner and process of
making and using it." 35 U.S.C. § 112 ¶ 1 (pre-AIA). This
requirement is met when "the disclosure of the application relied
upon reasonably conveys to those skilled in the art that the
inventor had possession of the claimed subject matter as of the
filing date." Forest Labs., LLC v. Sigmapharm Labs., LLC, 918 F.3d

41

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

928, 937 (Fed. Cir. 2019) (quoting Ariad Pharms., Inc. v. Eli Lilly
& Co., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)).

The patent's specification is not required to have "'either
examples or an actual reduction to practice'; rather, the critical
inquiry is whether the patentee has provided a description that
'in a definite way identifies the claimed invention' in sufficient
detail that a person of ordinary skill would understand that the
inventor was in possession of it at the time of filing." Alcon
Rsch. Ltd. v. Barr Labs., Inc., 745 F.3d 1180, 1190-91 (Fed. Cir.
2014) (quoting Ariad, 598 F.3d at 1350).

"A patent satisfies the written description requirement if
the specification 'allows [the POSA] to visualize or recognize the
identity of the subject matter purportedly described'; the patent
need not contain 'either examples or an actual reduction to
practice.'" Mylan at *63 (quoting Allergan, Inc. v. Sandoz, Inc.,
796 F.3d 1293, 1308 (Fed. Cir. 2015)). "[T]he test for sufficiency
[of written description] is whether the disclosure of the
application relied upon reasonably conveys to those skilled in the
art that the inventor had possession of the claimed subject matter
as of the filing date." Nalpropion Pharms. v. Actavis, 934 F.3d
1344, 1350 (Fed. Cir. 2019) (internal quotation omitted).  There
is no requirement, in the context of claim limitations that recite

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

ranges, that the specification provide any examples at all, much less examples for all embodiments throughout the range. Id.; Alcon Rsch., 745 F.3d at 1190-91 (explaining that the specification is not required to have "either examples or an actual reduction to practice"). The specification need not describe "every conceivable and possible future embodiment of [the] invention" for the patent to satisfy the written description requirement. Cordis Corp. v. Medtronic AVE, Inc., 339 F.3d 1352, 1365 (Fed. Cir. 2003). Further, "a patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed." Martek Biosciences Corp. v. Nutrinova, Inc., 579 F.3d 1363, 1371 (Fed. Cir. 2009).

### C. Regeneron Is Likely to Succeed on the Merits of the Product Patent

#### 1. Regeneron Is Likely to Succeed on Infringement of the Product Patent

Regeneron is likely to succeed on infringement of the Product Patent. As explained above, there are no infringement disputes between the parties, as Celltrion does not contest infringement except in the alternative. Opp. 17. Specifically, Celltrion states that "[s]hould the Court find the Asserted Claims valid because there is no evidence establishing the amount of oxidation, deamidation or other chemical instability" of aflibercept

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

formulations, then "Regeneron has failed to prove" infringement. Id. Regeneron makes no validity argument based on "the amount of oxidation, deamidation or other chemical instability" in any aflibercept formulation, and the Court does not base its validity decision on any such characteristic. Accordingly, Celltrion's conditional (and unexplained) non-infringement argument does not apply. Thus, as explained below, the Court credits the unrebutted declaration of Dr. Trout as to infringement and concludes that each limitation of the Asserted Product Patent Claims is met by CT-P42 vial and PFS.

### a. Undisputed Infringement Issues: CT-P42 vial meets the limitations of the Asserted Product Patent Vial Claims

**Claim 1.** Every Asserted Product Patent Vial Claim ultimately depends from claim 1. The Court credits Dr. Trout's unrebutted opinion that CT-P42 vial meets each limitation of claim 1 of the Product Patent. As Dr. Trout explained, Celltrion's aBLA states that ██████████████████████████████████████████████ ████████████████ ██ █ ████████ ████████ ████████ which meets the requirement of claim 1 of "[a] vial comprising an ophthalmic formulation suitable for intravitreal administration." Trout Decl. App. A ¶¶ 9-14.

Dr. Trout also explained that the requirement of "a vascular

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

endothelial growth factor (VEGF) antagonist . . . wherein said

VEGF antagonist fusion protein is glycosylated and comprises amino

acids 27-457 of SEQ ID NO:4" refers to glycosylated aflibercept,

which is described as "CT-P42" in Celltrion's aBLA.  Id. ¶¶ 15-

29.  First, Dr. Trout explained that the aflibercept in CT-P42

vial is a VEGF antagonist.  Id. ¶¶ 15-16.  Second, Dr. Trout

explained ██████████████████████████████████████████████████

██████████████████████████████████████ amino acids 27-457 of SEQ

ID NO:4.  Id. ¶¶ 17-24.  Third, Dr. Trout explained that

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████      ███████████████████

        Dr. Trout explained that Celltrion's CT-P42 vial product

meets the requirement of "an organic co-solvent" in claim 1.  Id.

¶¶ 32-48.  He explained that ████████████████████████████████████

████████████████████████████████ which is an organic co-solvent

under the Court's claim construction. ██████████████  ████████████

███  ███  ██████  ███  ████████  ███  █████  ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████  ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**



Dr. Trout further explained that Celltrion's CT-P42 vial product meets the requirement of "a buffer" in claim 1. ████████ He explained that ███████████████████████████████████████ ████ ████ ██████ ████████ █ ███████ █ ████████ █ ██████████ ███████████████████████████ ████

Dr. Trout further explained that Celltrion's CT-P42 vial product meets the requirement of "a stabilizing agent" in claim 1. ███████ He explained that ████████████████████████████ ████████████████████████████████ ███

Dr. Trout also addressed the limitation of claim 1 reciting "wherein at least 98% of the VEGF antagonist is present in native

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

conformation following storage at 5° C. for two months as measured by size exclusion chromatography." ▮▮▮▮▮▮▮ As Dr. Trout explained, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Dr. Trout also explained that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ As Dr. Trout concluded, Celltrion's CT-P42 vial product meets this limitation of claim 1.

Celltrion offered no argument or evidence that its CT-P42 product does not meet the foregoing limitations of claim 1.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ ▮▮▮ ▮▮▮ ▮ ▮ ▮▮ ▮▮▮ ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---



IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

██ ███ ██ ██ ████    The Court credits Regeneron's unrebutted evidence, including the declaration of Dr. Trout, that Celltrion's CT-P42 vial product meets each of the foregoing claim limitations.

Regarding the dependent claims, Celltrion did not dispute any limitations of any of the dependent claims of the Asserted Product Patent Vial Claims. Regeneron, through its expert Dr. Trout, explained that Celltrion's CT-P42 vial product meets each of these claim limitations, as summarized below. The Court credits Dr. Trout's unrebutted opinions.

**Claim 2.** All of the Asserted Product Patent Vial Claims also depend from claim 2. The Court credits Dr. Trout's opinion that Celltrion's CT-P42 vial product meets the requirement of claim 2 that "wherein the concentration of said VEGF antagonist fusion protein is 40 mg/mL." Trout Decl. App. A ¶¶ 30-31. Dr. Trout explained ██ ████ ███ ████ ████ ███ ████

███ ██ ███ █ ███ ████ ████ ███ █ █ █ ████

████████████████████████████

███████ ███████

**Claims 2, 4, and 5.** In addition to the "organic co-solvent" limitation of claim 1, the Court credits Dr. Trout's opinion that Celltrion's CT-P42 vial product meets the requirements of claim 2,

IN RE: AFLIBERCEPT PATENT LITIGATION                      1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

4, and 5: claim 2 specifies that "said organic co-solvent comprises polysorbate"; claim 4 specifies that "said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20"; and claim 5 specifies that "said organic co-solvent comprises 0.01% to 3% polysorbate 20." Id. ¶¶ 32-51, 75. As Dr. Trout explained, ███████████ ██████ ██████ ████ ██████ ██████ ██████ ██████ ██████ ████████████ and thus CT-P42 vial meets the requirements of claims 2, 4, and 5. ████████████

   **Claim 7.** Regarding claim 7, which recites "wherein said buffer comprises 5-25 mM buffer," the Court credits Dr. Trout's opinion that Celltrion's CT-P42 vial product contains a buffer as required by the Asserted Product Patent Vial Claims. Id. ¶ 52. Dr. Trout explained ████████████████████████████████ ███████████████████████████████████████ ███ Dr. Trout further explained ████████████████████████████ ████████████████████ which meets the requirements of claim 7. ████ ████████

   **Claim 9.** Regarding claim 9, the Court credits Dr. Trout's opinion that Celltrion's CT-P42 vial product meets the requirement that "wherein said buffer comprises a pH about 6.2-6.3." Id. ¶¶ 77-80. ████████████████████████████████ ███ ██ ███ ███ ████ ████ ████ ███ ███ ████ ████ ███

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

██████████████  ████  ████████████  ████████  █  ████████  ████████

████████████████████████████████████  ████

  **Claims 10 and 11.** Regarding claims 10 and 11, the Court credits Dr. Trout's opinion that Celltrion's CT-P42 vial product meets the limitations of these claims. Id. ¶¶ 81-82. He explained that ████████████████████████████████████████████ so CT-P42 vial meets the requirement of claim 10 that "said stabilizing agent comprises a sugar." Id. ¶ 82. ███ ████████

████████████████████████████████████████

███████████████████████████ so CT-P42 vial meets the requirement of claim 11 that "wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol." Id.

  **Claim 14.** Regarding claim 14, the Court credits Dr. Trout's opinion ████████████████████████████████

██████████████████████  ████████████ Thus, CT-P42 vial meets the requirement of claim 14 that "wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO:4."

  **Claim 15.** Regarding claim 15, the Court credits Dr. Trout's opinion that Celltrion's CT-P42 vial product meets the additional

IN RE: AFLIBERCEPT PATENT LITIGATION                          1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

limitation of this claim.  <u>Id.</u> ¶¶ 85-98.  Dr. Trout explained that

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████    ██████████████    ██████████████

███████████████████████████████████████████████████

CT-P42 vial meets the requirement of claim 15 that "said

formulation is capable of providing a turbidity of 0.01 or lower

at OD405 after 2 month storage at 5° C."  ████  ████  ███  █████

██████████  ████  █████  █████████  ██████  █████  ██████████████  █

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████  thus demonstrating

infringement of this limitation.  ███████████████

   **Claim 16.**  Regarding claim 16, the Court credits Dr. Trout's

opinion ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████  ███████████████  ████  █

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████  █████████████  ██████████████

██████████  ████  █████  █████████  █  ████  ██████  ██████  █████

███████████████████████████████████████████████████

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

aflibercept exhibiting at least 99% native conformation following storage at 5° C for two months, as construed by the Court. ███

████████████   Dr. Trout thus concluded that Celltrion's CT-P42 vial product meets this limitation of claim 16.

**Claim 17.**  The Court credits Dr. Trout's opinion ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████  ████████████  ██████████████████████

████████  ████  ██████  ████████  ████████  ████  ████

████████████████████████████████████  ████████

██████  ████  ████████  ████████████  ██████  ████

████████████████████████████████████████████████

██████████████████ aflibercept exhibiting at least 98% native conformation following storage at 5° C for 24 months, as construed by the Court.  ████████████   Dr. Trout thus concluded that Celltrion's CT-P42 vial product meets this limitation of claim 17.

**b. Undisputed Infringement Issues: CT-P42 PFS meets the limitations of the Asserted Product Patent PFS Claims**

**Claim 26.**  Every Asserted Product Patent PFS Claim ultimately depends from claim 26.  The Court credits Dr. Trout's opinion that CT-P42 PFS meets each limitation of claim 26 of the Product Patent. Dr. Trout explained that ████████████████████████████

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

███████████████████████████████████████████████████████████

████████████████████████████████████████████ which meets

the requirement of claim 26 of "[a] pre-filled syringe comprising

an    ophthalmic    formulation    suitable    for    intravitreal

administration." ███████████████

   Dr. Trout also explained that the requirement of "a vascular

endothelial growth factor (VEGF) antagonist . . . wherein said

VEGF antagonist fusion protein is glycosylated and comprises amino

acids 27-457 of SEQ ID NO:4" refers to glycosylated aflibercept,

██████████████████████████████████████   ████████████████

████   First, Dr. Trout explained that ████████████████████████

██████████████████████████   ██████████████  Second, Dr. Trout

explained that ████████████████████████████████████████████

███████████████████████████████████████████████████████████

███   ███████   ████   ███  ███████   Third, Dr. Trout explained that

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████   ████████████████

██████

   Dr. Trout explained that Celltrion's CT-P42 PFS product meets

the requirement of "an organic co-solvent" in claim 26. ████████

██████████████   He explained that ████████████████████████████

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---



Specifically, Dr. Trout explained that ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ In addition, Dr. Trout detailed that ▮▮▮▮▮

Dr. Trout explained that ▮▮▮▮▮▮▮▮▮

Dr. Trout further explained that Celltrion's CT-P42 PFS product meets the requirement of "a buffer" in claim 26. ▮▮ He explained that ▮▮▮▮▮▮▮▮▮

Dr. Trout further explained that Celltrion's CT-P42 PFS product meets the requirement of "a stabilizing agent" in claim

IN RE: AFLIBERCEPT PATENT LITIGATION                        1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

26.    ██████████    He explained that ████████████████████████

████████████████████████████████████████    ████

     Dr. Trout also addressed the limitation of claim 26 reciting "wherein at least 98% of said VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography."  ████████████████    As Dr. Trout explained, ████████████████████████████

████████████████████████████████████████████

████████████████████    ████████████    Dr. Trout also explained that ██  ████████████  ██  ████████████  ████  ████████

████████████████████████████████████████████

aflibercept exhibiting at least 98% native conformation following storage at 5° C for two months, as construed by the Court.  ████

████████████    Dr. Trout thus concluded that Celltrion's CT-P42 PFS product meets this limitation of claim 26.

     Celltrion offered no argument or evidence that its CT-P42 product does not meet the foregoing limitations of claim 26. Specifically, Celltrion and its expert Dr. Tessier do not dispute that CT-P42 infringes the 98% native conformation limitation

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████  ██████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

███████████████████████  The Court credits Regeneron's unrebutted evidence, including the declaration of Dr. Trout, that Celltrion's CT-P42 PFS product meets each of the foregoing claim limitations.

Regarding the dependent claims, Celltrion did not dispute any limitations of any of the dependent claims of the Asserted Product Patent PFS Claims. Regeneron, through its expert Dr. Trout, explained that Celltrion's CT-P42 PFS product meets each of these claim limitations, as summarized below. The Court credits Dr. Trout's unrebutted opinions.

**Claim 27.** All of the Asserted Product Patent PFS Claims also depend from claim 27. The Court credits Dr. Trout's opinion that Celltrion's CT-P42 PFS product meets the requirement of claim 27 that "wherein the concentration of said VEGF antagonist fusion protein is 40 mg/mL." Trout Decl. App. A ¶¶ 129-130. Dr. Trout explained that ███████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████   ████████████

**Claims 27, 29, and 30.** In addition to the "organic co-solvent" limitation of claim 26, the Court credits Dr. Trout's opinion that Celltrion's CT-P42 PFS product meets the requirements

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

of claim 27, 29, and 30: claim 27 specifies that "said organic co-solvent comprises polysorbate"; claim 29 specifies that "said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20"; and claim 30 specifies that "said organic co-solvent comprises 0.01% to 3% polysorbate 20." ███████████████ Dr. Trout explained that ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████     █████████████████

**Claim 32.** Regarding claim 32, which recites "wherein said buffer comprises 5-25 mM buffer," the Court credits Dr. Trout's opinion that Celltrion's CT-P42 PFS product contains a buffer as required by the Asserted Product Patent PFS Claims. ████████████ Dr. Trout explained that ██████████████████████████

████████████████████████████████████████  █████  Dr. Trout further explained that █████████████████████████████████

█████████████████████████████████████████  █████

███████████

**Claim 34.** Regarding claim 34, the Court credits Dr. Trout's opinion that Celltrion's CT-P42 PFS product meets the requirement that "wherein said buffer comprises a pH about 6.2-6.3." ████

████████  Specifically, ██████████████████████████████

███ █ ██ ██ ██ ███ ████ ███ ████ ███ ███ ████ ██ ████

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

███████████  ██████████████  ██████████  ▮  ███████  ██████

████████████████████████████████████████████  ██████████████

██████

    **Claims 35 and 36.** Regarding claims 35 and 36, the Court credits Dr. Trout's opinion that Celltrion's CT-P42 PFS product meets the limitations of these claims. ████ ████ ██████████. He explained that ████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████  ██████████████ He further explained that ██████████████████████████████████

██████████████████████████████████████ meets the requirement of claim 36 that "wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol." Id.

    **Claim 39.** Regarding claim 39, the Court credits Dr. Trout's opinion █████████████████████████████████████████████

███████████  ███  ██████  ████████  ██  █████  ██  ██  ██████

███████████ Thus, CT-P42 PFS meets the requirement of claim 39 that "wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO:4."

IN RE: AFLIBERCEPT PATENT LITIGATION                              1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

**Claim 40.** Regarding claim 40, the Court credits Dr. Trout's opinion that Celltrion's CT-P42 PFS product meets the additional limitation of this claim. Id. ¶¶ 181-194. Dr. Trout explained that ███████████████████████████████████████

███████ ███████ ██ ██████ ███████ ██ ███████ ██ ██

████████████████████████████  ███████████████  Dr. Trout explained that ███ ████████ ███ ████ ██ █████████

████████████████████ meets the requirement of claim 40 that "said formulation is capable of providing a turbidity of 0.01 or lower at OD405 after 2 month storage at 5° C." ██████████████████ Further, Dr. Trout explained that the ████████ ████████ ██ ██████████ ██████ ██████████ ██

████████████████████ capable of providing a turbidity of 0.01 or lower at OD405 after 2 months storage at 5° C, thus demonstrating infringement of this limitation. ███████████

██████

**Claim 41.** Regarding claim 41, the Court credits Dr. Trout's opinion that ████████████████████████████████████████

████████████████████████████████████████

██████████████████  ███████████████  Dr. Trout explained that ███ ██ ███ ██ ████████ ████ ████ ██ ████ ████ ████

████████████████████████████████████████

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

███████  ████████   ███  █ ████   Dr. Trout also explained ████  ██

███████████████  █  ████████████  █████  █████████  ████  ███████  █

████████████████████████  aflibercept exhibiting

at least 99% native conformation following storage at 5° C for two

months under the Court's construction. █████████████████    Dr.

Trout thus concluded that Celltrion's CT-P42 PFS product meets

this limitation of claim 41.

**Claim 42.** The Court credits Dr. Trout's opinion that ████

████████████████████████  at least 98% aflibercept in

native conformation following storage at 5° C for 24 months as

measured by SEC. ████████████████████████    Dr.

Trout explained that ████████████████████████████████

████████████████████████████████████████████████████

████████████████  ████████.  Dr. Trout also explained that

████████████████████████████████████████████████████

████████████████████████  aflibercept exhibiting

at least 98% native conformation following storage at 5° C for 24

months under the Court's construction. ████████████████████

Dr. Trout thus concluded that Celltrion's CT-P42 PFS product meets

this limitation of claim 42.

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

### 2. Regeneron Is Likely To Succeed on the Validity of the Product Patent

Celltrion advances two invalidity defenses to the Product Patent: obviousness-type double patenting, and lack of written description. Opp. 6-17. For the following reasons, Celltrion's arguments do not raise a "substantial question" of validity of the Product Patent, and Regeneron has established a likelihood of success on the merits regarding the Product Patent's validity. See Titan Tire, 566 F.3d at 1380.

#### a. Obviousness-Type Double Patenting

Celltrion argues that the Product Patent is invalid for nonstatutory obviousness-type double patenting over claim 5 of U.S. Patent No. 9,340,594 (the "'594 patent," (ECF No. 108-11, Trout Ex. 74)). Opp. 7-16. Regeneron responds that the '594 patent is not a proper reference patent for ODP against the Product Patent. Reply at 1-2. And even if the '594 patent were an ODP reference patent, Regeneron contends that the asserted claims of the Product Patent are patentably distinct over claim 5 of the '594 patent ("'594 claim 5") for multiple reasons. Id. at 2-9.

There is no dispute that the asserted claims of the Product Patent and '594 claim 5 differ in several respects. First, all asserted claims of the Product Patent require that the VEGF antagonist "is glycosylated," while '594 claim 5 is silent as to

IN RE: AFLIBERCEPT PATENT LITIGATION                   1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

glycosylation. Second, the asserted claims of the Product Patent recite that "at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography," while '594 claim 5 does not recite such level of native conformation. Third, asserted claims 4, 7, 9, 11, and 14-17 of the Product Patent recite a "vial" while '594 claim 5 requires a "pre-filled syringe."

Regeneron argues that each of these differences independently constitutes a patentable distinction over '594 claim 5 that forecloses ODP. Id. Regeneron further argues that objective evidence of nonobviousness further rebuts ODP. Id. at 9.

The Court agrees with Regeneron that Celltrion has not met its burden of showing a substantial question of ODP. As discussed further below, the Court concludes that the '594 patent is not a proper ODP reference patent to the Product Patent. Furthermore, the Court concludes that each of the differences between the asserted claims of the Product Patent and '594 claim 5 constitutes a patentable distinction that precludes ODP.

### 1) The '594 patent is not a proper ODP reference

The '594 Patent is a Regeneron patent directed to "[o]phthalmic formulations of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist . . . suitable for

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

intravitreal administration to the eye." '594 Patent at Abstract.
The '594 Patent was filed on June 14, 2014 and granted on May 17,
2016. Like the Product Patent, the '594 Patent is a continuation
of U.S. Pat. Appl. No. 11/818,463, which was filed on June 14,
2007. Both the '594 Patent and the Product Patent share the same
specification, priority date, and statutory term.

During the '594 patent prosecution, the Examiner rejected the
claims on the ground of nonstatutory obviousness-type double
patenting. July 14, 2014 Final Office Action, U.S. Pat. Appl. No.
14/330,096, at 6 (ECF No. 142-10, Tessier Ex. 51). In the
rejection letter, the PTO informed Regeneron that "[a] timely filed
terminal disclaimer in compliance with 37 CPR 1.321(c) or 1.321(d)
may be used to overcome an actual or provisional rejection based
on a nonstatutory double patenting ground." Id. at 5. Regeneron
then filed a terminal disclaimer to another patent that expired in
2021 (via yet another terminal disclaimer) "[s]olely in the
interest of promoting prosecution and reserving the right to pursue
the subject matter in another application." Response to Final
Office Action, Appl. No. 14/330,096 (Filed July 14, 2014) (ECF No.
142-10, Tessier Ex. 51). The application that became the '594
patent was then granted.

As explained in detail below, because the Product Patent and

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

the '594 Patent share the same parent patent and have the same
statutory term, the '594 Patent cannot be an ODP reference for the
Product Patent simply because the '594 patent expired after a
terminal disclaimer.

"Nonstatutory double patenting is a judicially created
doctrine grounded in public policy that prevents the extension of
the term of a patent . . . ." Otsuka Pharm., 678 F.3d at 1297
(cleaned up).  "Since the inception of our patent laws," it has
been recognized that an individual cannot "obtain[] more than one
patent on the same invention." AbbVie, 764 F.3d at 1372.  As
Justice Story explained in 1819, "if [a patentee] can successively
take out at different times new patents for the same
invention . . . it would completely destroy the whole
consideration derived by the public for the grant of the patent,
the right to use the invention at the expiration of the term
specified in the original grant." Id. (citing Odiorne v. Amesbury
Nail Factory, 18 F. Cas. 578, 579 (C.C.D. Mass. 1819)).  In other
words, "[t]he ban on double patenting ensures that the public gets
the benefit of the invention after the original period of monopoly
expires." Id.

If there is no extension of the original monopoly period,
i.e., the statutory term of the patent grant, there cannot be ODP.

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Because both the '594 patent and the Product Patent are continuations of application No. 11/818,463, filed on June 14, 2007, both patents share the same specification, priority date, and statutory term — i.e., "20 years" from the date "such application was filed," June 14, 2027. 35 U.S.C. § 154(a)(2). The original monopoly period of the entire patent family runs from June 14, 2007 to June 14, 2027. Therefore, the '594 patent cannot be an ODP reference for the Product Patent because the Product Patent does not and cannot extend the original monopoly period of any patent in its family.[7]

The fact that, during the '594 patent prosecution, Regeneron filed a "terminal disclaimer" to another patent that expired in 2021 does not change this conclusion. The '594 patent was rendered unenforceable before the end of its statutory 20-year term, and before the statutory term of the Product Patent, solely due to this terminal disclaimer. Regeneron filed the terminal disclaimer "[s]olely in the interest of promoting prosecution and reserving the right to pursue the subject matter in another application."

---

[7] As noted in In re Cellect, LLC, the original monopoly period does not include any extension granted pursuant to Patent Term Adjustment under 35 U.S.C. § 154(b). 81 F.4th 1216 (Fed. Cir. 2023). No such extension is present in connection with the Product Patent, which expires after its statutory 20-year term on June 14, 2027.

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Response to Final Office Action, Appl. No. 14/330,096 (Filed July 14, 2014). As the Federal Circuit has held, "the filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither presumption nor estoppel on the merits of the rejection." Quad Env't. Techs. Corp. v. Union Sanitary Dist., 946 F.2d 870, 874 (Fed. Cir. 1991); see Motionless Keyboard Co. v. Microsoft Corp., 486 F.3d 1376, 1385 (Fed. Cir. 2007) ("A terminal disclaimer simply is not an admission that a later-filed invention is obvious."); Ortho Pharm. Corp. v. Smith, 959 F.2d 936, 941 (Fed. Cir. 1992) (rejecting argument that patent applicant admitted to obviousness-type double patenting by filing terminal disclaimer). Instead, a terminal disclaimer is a voluntary filing by a patentee that "dedicate[s] to the public" part of the patent's term. 35 U.S.C. § 253(b).

Celltrion has cited no authority for the proposition that the filing of a terminal disclaimer in one patent can invalidate a related patent for ODP. In contrast, the only case cited by the parties that addressed whether one patent's terminal disclaimer can invalidate a related patent for ODP held that it could not. See Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc., 217 F. Supp. 3d 782, 787-88 (D. Del. 2016). Specifically, in Merck the

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

defendant alleged that a terminal disclaimer caused a patent to
expire earlier than the asserted patent and thus rendered it
invalid for ODP.  <u>Id.</u> at 787.  The court's illustration of the
various expiration dates in <u>Merck</u> is shown below:



<u>Id.</u>  As the depiction shows, the alleged '781 reference patent
expired before the asserted ('353) patent solely due to a terminal
disclaimer.  And <u>Merck</u> held that the '781 patent "from the same
family" could not serve as an ODP reference patent:  "[u]nder the
particular circumstances, the oddity of using the '781 patent as
a reference patent to cut short the '353 patent's (the first issued
parent patent) term of exclusivity is rejected.  This is not an
instance of a patentee seeking to extend the patent term with
'sequential' applications."  <u>Id.</u>  The Court agrees with the

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

analysis in Merck; just as in that case, Regeneron does not seek any "extension of the term of a patent" contrary to the equitable principles underlying ODP.  Otsuka Pharm., 678 F.3d at 1297.  It seeks only the 20-year statutory term afforded under the statute.  35 U.S.C. § 154(a)(2).  As illustrated below, the facts here are not meaningfully distinguishable from Merck:



| *Merck* | This Case |
|---|---|
| 10/3/2017 '353 Patent Expires | 6/14/2027 '865 Patent Expires |
| Terminal Disclaimer | Terminal Disclaimer |
| 9/30/2015 '781 patent Expired due to Terminal Disclaimer | 1/30/2019 '781 patent Full 17-Year Term | 3/7/2021 Expiration due to Terminal Disclaimers | 6/14/2027 '594 Full 20-Year Term |

As Celltrion points out, "[w]hen a patent issues subject to a terminal disclaimer, the patentee . . . reduced the [patent] term itself by effectively eliminating the disclaimed portion from the original patent."  In re Yamazaki, 702 F.3d 1327, 1333 (Fed.

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Cir. 2012). Yamazaki, however, did not address the ODP doctrine, and no court has extended it to that context to hold that the filing of a terminal disclaimer in one patent can invalidate a related patent for ODP. In contrast, the mere fact that two patents have different expiry dates does not automatically give rise to ODP. For example, in Hoffmann-La Roche Inc. v. Orchid Chems. & Pharms. Ltd., 2011 WL 4433575, at *3 (D.N.J. Mar. 17, 2011), the court held there was no ODP where an alleged reference patent expired before its statutory term due to nonpayment of maintenance fees, "since it does nothing to effectuate the prohibition against double patenting." Id.; see also Novartis AG v. Ezra Ventures LLC, 909 F.3d 1367, 1374-75 (Fed. Cir. 2018) (rejecting ODP challenge even though related patents expired on different dates as a result of patent term extension under 35 U.S.C. § 156). Here too, the Court finds that "it does nothing to effectuate the prohibition against double patenting" to essentially propagate a terminal disclaimer from one patent in the family to another. Roche, 2011 WL 4433575, at *3. Indeed, the Federal Circuit has rejected ODP challenges premised on extending terminal disclaimers throughout a family. See Ortho Pharm Corp., 959 F.2d at 941.

The cases cited by Celltrion do not compel a different

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

conclusion.   In   Gilead   Sciences,   Inc.   v.   Natco   Pharma   Ltd.,

"[d]espite the[] similarities in content" between two patents (the

'375 patent and '483 patent), the patentee filed the '375 patent

and then "crafted a separate 'chain' of applications, having a

later priority date than the '375 patent family" that "resulted in

the issuance of the '483 patent."  753 F.3d 1208, 1210 (Fed. Cir.

2014).   Thus, the asserted patent and the reference patent had

different statutory terms.   The specific question at issue in

Gilead was "whether a later-issued patent can serve as a double

patenting reference for an earlier-issued patent if the later one

expires first."  Id. at 1214.   The Federal Circuit held that it

could.   Id. at 1217.   But that is irrelevant to the question of

the effect of terminal disclaimer on the ODP analysis here;

regardless of the respective issuance dates of the Product Patent

and the '594 patents, the patents undisputedly share the same

priority date and 20-year term, but for the '594 patent's terminal

disclaimers.

Gilead is further distinguishable from this case because, as

the Federal Circuit later explained in Novartis, the Gilead

decision was driven by the court's concern about the potential

"gamesmanship issue" that could arise if ODP were based solely on

a patent's issue date.  Novartis, 909 F.3d at 1374.   Gilead

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

prevented "a situation where 'inventors could routinely orchestrate' longer patent-exclusivity periods by (1) filing serial patent applications on obvious modifications of an invention, (2) claiming different priority dates in each, and then (3) strategically responding to prosecution deadlines such that the application claiming the latest filing date issues first, without triggering a terminal disclaimer for the earlier filed applications." Id. at 1375 (quoting Gilead, F.3d at 1215). This potential for gamesmanship is not at issue in a case, like the one here, where the two patents claim the same priority date and thus share the same 20-year term. Merck similarly found Gilead to be inapplicable when the putative reference patent only expired before the asserted patent because of a terminal disclaimer because it "is not an instance of a patentee seeking to extend the patent term with 'sequential' applications." Merck, 217 F. Supp. 3d at 787-88.

Similar gamesmanship was at play in AbbVie, 764 F.3d 1366. There, the patentee "claimed a priority date of October 8, 1992 (the filing date of an earlier application), for the '766 patent" and "claimed a later priority date [for the '442 patent], August 1, 1996 (the filing date of the application that issued as the '766 patent), so that the '442 patent would expire after the '766

71

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

patent." Id. at 1373 n.2.  The Court held that the patentee "is not entitled to an extra six years of monopoly solely because it filed a separate application unless the two inventions are patentably distinct." Id. at 1374.  As in Gilead, AbbVie did not and could not address the effect of terminal disclaimer of the putative reference patent on the ODP analysis.

Unlike the patentees in Gilead and AbbVie, Regeneron did not attempt to circumvent the expiration of the '594 patent by creating a different priority chain for the Product Patent to extend its term.  The terminal disclaimer of the '594 patent does not change the fact that both patents have the same priority date, and the Product Patent's term never has been extended.  Accordingly, the '594 patent cannot be an ODP reference for the Product Patent. Therefore, because Celltrion's ODP theory of invalidity relies on an improper ODP reference patent, Regeneron has established a likelihood that it will succeed on Celltrion's ODP defense.

**2) The Product Patent claims are patentably
   distinct from Celltrion's asserted reference
   claim**

The Court further concludes that even if the '594 patent were a proper reference patent, Celltrion has not raised a substantial question that the Product Patent is invalid for ODP.

Unlike Celltrion's asserted ODP reference claim, '594 claim

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

5, the asserted claims of the Product Patent recite a "glycosylated" protein and 98% native conformation. As explained in more detail below, because '594 claim 5 does not disclose each and every limitation in the asserted claims, either expressly or inherently, '594 claim 5 does not anticipate the asserted claims. With regards to obviousness, this Court finds that (1) the POSA lacked motivation to use glycosylated aflibercept, a requirement of the Product Patent but not '594 claim 5;[8] (2) the Product Patent's "98% native conformation" claim limitation is not inherent in claim 5 of the '594 patent; (3) the POSA lacked motivation to change '594 claim 5's PFS to the Product Patent's vial; and (4) objective evidence strongly supports nonobviousness of the Product Patent's asserted claims.[9] The only ODP reference claim asserted by Celltrion is '594 claim 5, and as explained below, Celltrion has not met its burden to show a substantial question that the Product Patent's asserted claims are anticipated or obvious over '594 claim 5; accordingly, the Court holds that Regeneron is likely to succeed on ODP.

---

[8] This finding is consistent with this Court's identical finding in Regeneron v. Mylan.  2024 WL 382495, at *54-55.
[9] This finding is also consistent with the Court's Mylan decision. Mylan, 2024 WL 382495, at *59.

## ** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

### a) Claim Construction

The first step in the ODP analysis requires construing the disputed terms of the relevant claims. <u>AbbVie</u>, 764 F.3d at 1374. Celltrion's ODP reference claim, claim 5 of the '594 patent, is set forth below along with the pertinent claims from which claim 5 depends:

> 3. The pre-filled syringe according to claim 2, wherein the VEGF trap is stable for at least 4 months.
>
> 4. The pre-filled syringe according to claim 3, wherein the VEGF trap consists of amino acids 27-457 of SEQ ID NO:4.
>
> 5. The pre-filled syringe according to claim 4, wherein the stable ophthalmic formulation comprises 40 mg/mL of the VEGF trap, 10 mM phosphate, 40 mM NaCI, 0.03% polysorbate 20, 5% sucrose, at pH 6.2-6.4.

The parties dispute the construction of two terms: "stable" and "VEGF trap."

### i.  "Stable"

Celltrion argues that "stable" should be construed to require the VEGF trap protein to be in at least 98% native conformation as measured by size-exclusion chromatography ("SEC") after 2-month storage at 5 degrees C, the requirement recited in the asserted claims of the Product Patent.  Opp. 9.  Regeneron argues that "stable" does not have the limited meaning that Celltrion urges

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

and that the term carries its plain and ordinary meaning in view of the specification of the '594 patent.  Reply 6.  For the following reasons, the Court agrees with Regeneron.[10]

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (cleaned up).  The POSA "is deemed to read the claim term . . . in the context of the entire patent, including the specification."  Id. at 1313.

The specification of the '594 patent makes clear that a POSA would not understand "stable" as limited to "98% native conformation as measured by SEC."  The specification of the '594 patent has numerous descriptions of stability beyond simply 98% native conformation as measured by SEC.  First, the '594 patent specification teaches that "at least 90%" non-aggregated protein

---

[10] Celltrion also argues that "stable" should be construed to include a formulation capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2-month storage at 5 degrees C.  Opp. 7-9.  Because the Court holds that "stable" is not properly construed to require at least 98% native conformation as measured by size-exclusion chromatography ("SEC") after 2-month storage at 5 degrees C, it need not decide the turbidity construction issue at this time as a decision one way or the other would not change the outcome of this case.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

is preferred, thereby confirming that levels of non-aggregation below 98% in the patent's formulations are not only permissible, but desirable. '594 patent 6:15-25. Second, the patent describes multiple aspects of stability, including aggregation, deamination, and precipitation. Id., 5:27-34 ("Proteins possess unique chemical and physical properties that present stability problems: a variety of degradation pathways exist for proteins, implicating both chemical and physical instability. Chemical instability includes deamination, aggregation, clipping of the peptide backbone, and oxidation of methionine residues. Physical instability encompasses many phenomena, including, for example, aggregation and/or precipitation."). Third, the patent describes multiple ways to determine stability, including visual inspection of color and appearance, SDS-PAGE, isoelectric focusing, and SEC. Id., 6:42-48 ("Stability is determined in a number of ways at specified time points, including determination of pH, visual inspection of color and appearance, determination of total protein content by methods known in the art, e.g., UV spectroscopy, and purity is determined by, for example, SDS-PAGE, size-exclusion HPLC, bioassay determination of activity, isoelectric focusing, and isoaspartate quantification."). These disclosures confirm that "stable" has a broader meaning than the particular SEC

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

measurements of aggregation and threshold levels (98%) to which Celltrion attempts to limit the term.

Experts from both sides agree that the term "stable" in claim 5 of the '594 patent is not limited to 98% native conformation as measured by SEC. As Regeneron's expert, Dr. Trout, explained in his declaration, a person of ordinary skill in the art ("POSA") would not understand the meaning of "stable" as being limited to percent native conformation as measured by SEC. Trout Decl. ¶ 385. He further explained that if stability is measured by percent native conformation by SEC, then the POSA would understand that the fusion protein can be stable despite having less than 98% native conformation by SEC. Trout Decl. ¶¶ 386-387. Dr. Trout explained that both the specification and the ordinary meaning of the term to practitioners in the field supported this broader understanding of "stable" as encompassing less than 98% and types of stability other than those measured by SEC. Trout Decl. ¶¶ 385-87. Celltrion's expert, Dr. Tessier, agreed. In his declaration, he did not dispute Dr. Trout's evidence or conclusions that the ordinary understanding of "stable" to the POSA includes percentages below 98%. Tessier Decl. ¶¶ 154-55, 160. Dr. Tessier testified at his deposition that "[i]t's [his] understanding that the term stable in claim 5 would include the stability, for

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

example, in example 4, but it's not necessarily limited to it."
Tessier Tr. 15:1-9 (ECF No. 157-3, Patel Ex. 2) (emphasis added).
The undisputed ordinary meaning of "stable" as including stability
below 98% controls.  Thorner v. Sony Comput. Ent. Am. LLC, 669
F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a claim are
generally given their ordinary and customary meaning as understood
by a person of ordinary skill in the art when read in the context
of the specification and prosecution history," unless either of
the "only two exceptions" apply, lexicography or disavowal).

    The Court's conclusion is bolstered by the fact that another
patent in the same family as the Product Patent and the '594 patent
claims a "stable ophthalmic formulation" "wherein 90% or more of
the weight of the fusion protein is not present as an
aggregate" — thus indicating that the meaning of "stable" does not
implicitly require 98% native conformation by SEC.  Specifically,
claims 1 and 2 of U.S. Patent 9,914,763 (the "'763 patent"), which
shares the same specification as the '594 patent, read as follows:

> 1.  A prefilled glass syringe suitable for
> intravitreal administration containing a stable
> ophthalmic formulation, comprising:
>
> a vascular endothelial growth factor (VEGF)
> antagonist,
>
> an organic co-solvent,
>
> a buffer, and

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

> a stabilizing agent,
>
> wherein the VEGF antagonist is a fusion protein produced in a Chinese Hamster Ovary (CHO) cell, the fusion protein comprising an immunoglobin-like (Ig) domain 2 of a first VEGF receptor and Ig domain 3 of a second VEGF receptor, and a multimerizing component.
>
> 2. The prefilled glass syringe of claim 1, <u>wherein 90% or more of the weight of the fusion protein is not present as an aggregate</u>.

'763 patent (Trout Ex. 76, ECF No. 108-11) (emphases added). Because claim 2 depends from claim 1, it must "specify a further limitation of the subject matter claimed" in the independent claim from which it depends, 35 U.S.C. § 112(d), and "stable" in claim 1 must be broader than the "90% or more" limitation in claim 2. Consistent with the statute, the Federal Circuit has held that it is improper for courts to construe claims such that a dependent claim would "have no scope and thus be meaningless." <u>Littelfuse, Inc. v. Mersen USA EP Corp.</u>, 29 F.4th 1376, 1380 (Fed. Cir. 2022). That is precisely what Celltrion's proposed construction does, however. Under Celltrion's construction, claim 2 of the '763 patent is meaningless because "stable" would already require a higher level of non-aggregates (98% native conformation) than the "90% or more . . . not present as an aggregate" recited in dependent claim 2. In other words, Celltrion's construction not only reads an unwritten numerical aggregate limitation into "stable," it also

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

reads in a stricter threshold than what claim 2 specifies expressly. Such a construction would render claim 2 of the '763 patent a nullity, inconsistent with the Federal Circuit's clear precedent. That court likewise has dictated that claim terms appearing in multiple patents in a family, such as "stable" in the '763 and '594 patents here, must be construed consistently between across those patents. See SightSound Techs., LLC v. Apple Inc., 809 F.3d 1307, 1316 (Fed. Cir. 2015) ("[W]here multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents." (internal quotation omitted)); Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1334 (Fed. Cir. 2003) (noting that claim terms in related patents should be construed consistently). Applying Celltrion's proposed construction to the '763 patent, claim 2 of would improperly "have no scope and thus be meaningless," as "stable" in claim 1 would require a more stringent stability limitation than the one set forth in dependent claim 2.

The prosecution history further reinforces that "stable" does not require 98% native conformation. The Examiner reviewing the Product Patent concluded that the 98% native conformation limitation in the Product Patent was patentably distinct

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

over — i.e., not inherent in, and different from — the '594 patent's claims to a "stable" formulation. During Prosecution of the Product Patent, the Examiner initially entered an ODP rejection based on the '594 patent. Product Patent File History at RGN-EYLEA-BIOSIM-00016064 (ECF No. 108-11, Trout Ex. 66). Regeneron explained that the Product Patent claims were patentably distinct, explaining that the claims that ultimately issued in the Product Patent recited "the stability of the protein conformation in storage over a period of time" — i.e., the 98% native conformation limitation—whereas the '594 claims did not. Id. at -085-086. The Examiner then allowed the claims. Id. at 109-110. This intrinsic evidence further supports that the 98% native conformation by SEC limitation is distinct from "stable" as recited in the claims of the '594 patent. The Court is not persuaded by Celltrion's construction of "stable" to make those distinct concepts the same.

Thus, properly understood, "stable" as required in '594 claim 5 is broader than, and not limited to, "at least 98% . . . native conformation . . . as measured by size exclusion chromatography." Having concluded that "stable for at least 4 months" is not limited to 98% native conformation as measured by SEC, the Court need not further construe that term in the '594 patent to resolve the parties' dispute. See Nidec Motor Corp. v. Zhongshan Broad Ocean

IN RE: AFLIBERCEPT PATENT LITIGATION                     1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Motor Co., 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[Courts] need only construe terms . . . to the extent necessary to resolve the [parties'] controversy.") (internal quotation omitted)).

### ii.    "VEGF Trap"

Celltrion argues that the term "VEGF trap" in claim 5 of the '594 patent should be construed to require glycosylation at five specific residues in the protein's amino acid sequence.  Opp. 9-10.  Regeneron responds that the term "VEGF trap" should not be construed as including Celltrion's proposed glycosylation requirement, given that this term (like the rest of claim 5 of the '594 patent) does not recite any glycosylation requirement.  Reply 3-4.

The Court agrees with Regeneron.  Neither '594 claim 5 nor any claim from which it depends recites any limitation with respect to glycosylation.  It is black letter law that courts cannot "read limitations from the specification into the claims." Thorner, 669 F.3d at 1366; see also Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc) ("The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims."); Phillips, 415 F.3d at 1319-20 (explaining that "one of the cardinal sins of patent law" is to "read[] a limitation from the written description

IN RE: AFLIBERCEPT PATENT LITIGATION                      1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

into the claims" (internal quotation omitted)). Celltrion
provides no basis in either the claim language or the specification
for such a glycosylation limitation in '594 claim 5.

Celltrion's construction, moreover, would render meaningless
the express glycosylation limitations in the Product Patent
claims. As the Federal Circuit has explained, "[i]t is highly
disfavored to construe [claim] terms in a way that renders them
void, meaningless, or superfluous," but that is what Celltrion's
proposed construction does. Intel Corp. v. Qualcomm Inc., 21 F.4th
801, 810 (Fed. Cir. 2021) (quoting Wasica Finance GmbH v.
Continental Automotive Systems, Inc., 853 F.3d 1272, 1288 n.10
(Fed. Cir. 2017)); see Littelfuse, 29 F.4th at 1380. The "VEGF
trap" recited in claim 5 of the '594 patent possesses the identical
amino acid sequence as that recited in claim 1 of the Product
Patent. Compare '594 patent, claim 4 (claiming a "VEGF trap
consists of amino acids 27-457 of SEQID NO:4," upon which claim 5
depends), with Product Patent, claim 1 ("wherein said VEGF
antagonist fusion protein is glycosylated and comprises amino
acids 27-457 of SEQ ID NO:4"). Regeneron drafted claim 5 of the
'594 patent not to include any glycosylation requirement. By
contrast, Regeneron drafted claim 1 of the Product Patent expressly
to require glycosylation. See Product Patent, claim 1 ("wherein

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

said VEGF antagonist fusion protein is glycosylated") & claim 14 ("wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4").

The differences in the claims of these related patents indicate that claim 5 of the '594 patent should not be construed to require glycosylation.  Claim terms in related patents must be interpreted consistently.  SightSound, 809 F.3d at 1316 ("[W]here multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents." (internal quotation omitted)).  Doing so here, under Celltrion's construction, would render both the "is glycosylated" limitation of claim 1 (required by all asserted Product Patent claims) and the entirety of claim 14 (which requires glycosylation at specified sites) nullities — a "highly disfavored" result.  Intel, 21 F.4th at 810.

Further, Celltrion's proposed construction, which implies that the claimed aflibercept is necessarily glycosylated, contradicts undisputed evidence that aflibercept is not necessarily glycosylated.  Neither '594 claim 5 nor the Asserted Product Patent Claims limit the type of cell that may be used to produce the claimed protein.  As explained by experts on both

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

sides, aflibercept can be produced from different cells, only some
of which result in glycosylation of aflibercept. See Trout Decl.
¶¶ 107, 380 (explaining if E. Coli cells are used to produce
aflibercept, then the resulting aflibercept would not be
glycosylated); Id. ¶ 381 (stating that producing aflibercept in a
CHO cell "would not inevitably result in glycosylated
aflibercept"); Tessier Tr. 138:15-21 (agreeing that Daly, a prior
art reference, disclosed that glycosylation can be eliminated by
producing a protein in mutant CHO cell lines). Thus, contrary to
the implication of Celltrion's construction, both side's experts
agree that aflibercept is not necessarily glycosylated. That
conclusion is consistent with the prior-art reference Daly (U.S.
Patent Application Publication 2006/0058234), which explains that
mutant CHO cell lines can eliminate glycosylation in a VEGF
antagonist fusion protein. Daly ¶ 38 (ECF No. 108-11, Trout Ex.
61). It is also consistent with this Court's identical finding in
the Mylan post-trial decision. Mylan, 2024 WL 382495, at *55
("[E]ven if a protein contains amino acid sequences that may be
glycosylated, a given protein may not be glycosylated." (citing
Dr. Trout's testimony)).

In sum, the Court agrees with Regeneron that "VEGF trap"
should not be construed to mean "glycosylated VEGF trap."

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

### c. No motivation to use glycosylated aflibercept.

The second step of an ODP analysis requires comparing the construed reference patent claims with the asserted claims. AbbVie, 764 F.3d at 1374, 1378. As explained above, the parties agree that asserted reference claim 5 of the '594 patent differs in multiple respects from the asserted claims of the Product Patent. If any of those differences are not obvious or anticipated, Celltrion cannot prove ODP. The Court analyzes each of those differences in turn and concludes that Celltrion is not likely to succeed in proving that the Asserted Product Patent Claims are anticipated or rendered obvious by claim 5 of the '594 patent, thereby foreclosing a finding of ODP. Otsuka, 678 F.3d at 1298.

The Product Patent's asserted claims, unlike '594 claim 5, recite a "glycosylated" VEGF antagonist. Celltrion argues that (1) '594 claim 5 requires glycosylation and therefore anticipates the asserted claims, and (2) the POSA would have been motivated to use glycosylated aflibercept and therefore '594 claim 5 renders the asserted claims obvious. The Court disagrees with both of Celltrion's assertions and, based on the present record, finds that this difference between the reference claims and the Asserted Product Patent Claims is not indistinct.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

Celltrion argues that '594 claim 5 anticipates the asserted claims of the Product Patent because '594 claim 5 covers a genus that includes only two species, glycosylated and un-glycosylated aflibercept. Opp. 11. "It is well established that the disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus." Atofina v. Great Lakes Chem. Corp., 441 F.3d 991, 999 (Fed. Cir. 2006). However, "a very small genus can be a disclosure of each species within the genus." Id. Contrary to Celltrion's assertions, even considering only glycosylation, the genus claimed in '594 claim 5 encompasses more than just two species. Because aflibercept has five distinct glycosylation sites, Celltrion's expert, Dr. Tessier, agreed that there are at least thirty possible glycosylated forms of aflibercept, Tessier Tr. 130:21-131:8, in addition to the non-glycosylated form. This is not a "very small genus" for purposes of a finding of anticipation. Atofina, 441 F.3d at 999.

Moreover, for anticipation, a single reference must not only "disclose all elements of the claim within [its] four corners," but "all elements of a claimed invention arranged as in the claim." Net MoneyIN, Inc. v. Verisign, Inc., 545 F.3d 1359, 1369 (Fed. Cir. 2008) (emphasis added) (internal quotation omitted). But in addition to encompassing every glycosylation profile, '594 claim

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

5 recites a range of pH values from 6.2-6.4 and does not recite the 98% native conformation limitation recited in claim 1. Thus, the POSA would need to select not only a particular glycosylation profile, but also a specific pH value that results in 98% native conformation as recited in the Product Patent claims. Celltrion has cited no evidence that any other glycosylation profile than the one described in the patent (which may not be considered as prior art, see Eli Lilly, 689 F.3d at 1379-80), or a formulation at a pH of 6.4, would achieve 98% native conformation. Dr. Tessier clarified that he did not "have an opinion about that sequence without glycosylation at the five sites" and that there was no native conformation data (even in the non-prior-art patent) at pH 6.4. Tessier Tr. 117:12-20, 132:15-20, 133:18-19. Accordingly, Celltrion has not made a showing that the genus recited in '594 claim 5 is "very small" or that it recites every element of claim 1 of the Product Patent "as arranged in the claim," and thus has not shown a substantial question of anticipation. Atofina, 441 F.3d at 999; Net MoneyIN, 545 F.3d at 1369; Mylan, 2024 WL 382495, at *47-48 (rejecting similar anticipation argument).

Celltrion also argues that glycosylation would have been obvious because the POSA would have been motivated to use a glycosylated form of aflibercept as recited in the claimed

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

ophthalmic formulations.  However, the evidence shows that the
POSA would not have been motivated to use glycosylated aflibercept
for an ophthalmic formulation.

Obviousness addresses what is, "on balance, desirable," not
what is "feasible."  Winner Intern. Royalty Corp. v. Wang, 202
F.3d 1340, 1349 (Fed. Cir. 2000); see Orexo AB v. Actavis, 903
F.3d 1265, 1272-73 (Fed. Cir. 2018).  The prior art taught that
VEGF Trap proteins could be made in CHO cells and glycosylated
(Papadopoulos at 26:5-10 (ECF No. 108-12, Trout Ex. 84); Tessier
Decl. ¶¶ 99-102; Opp. 11-12) or made in E. coli or mutant CHO cells
and not glycosylated (Trout Decl. ¶ 107; Tessier Tr. 138:15-21;
Daly ¶¶ 38, 43).  And for an ophthalmic formulation like that
claimed in Product Patent, the prior art's teachings would have
motivated the POSA against using glycosylated aflibercept.  More
specifically, the art showed that a POSA would avoid glycosylation
because it would increase the size of aflibercept, thereby reducing
retinal penetration, and also because it would undesirably
increase systemic exposure and the risk of inflammation.  Trout
Decl. ¶¶ 376-82.

First, Daly taught that mini-Traps — substantially smaller
VEGF Trap molecules — including a "smaller, non-glycosylated mini-
trap expressed in E. coli . . . has optimized characteristics for

IN RE: AFLIBERCEPT PATENT LITIGATION                        1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

local, intravitreal delivery, i.e. a shorter serum half life for faster clearance and minimizing unwanted systemic exposure." Daly ¶¶ 38, 43. As this Court previously found, because aflibercept is larger when glycosylated, the POSA expected reduced retinal penetration and would thus "have sought to use nonglycosylated aflibercept because glycosylation increases size and thus decreases retinal penetration." Mylan, 2024 WL 382495, at *55 (citing Dr. Trout testimony). As the Court has previously recognized, numerous prior art references taught that larger molecules would have inferior retinal penetration. Id. at *14, 54 (citing Gaudreault, Jackson, Ghate); Ghate at 281 (ECF No. 108-9, Trout Ex. 26) (the retina's "internal limiting membrane is "impermeable to . . . globular molecules > 70 kDa"); Jackson at 2141 (ECF No. 108-9, Trout Ex. 28) ("The [retinal exclusion limit] in human tissue was 76.5 ± 1.5 kDa."); Gaudreault at 726, 731 (ECF No. 108-9, Trout Ex. 24) ("[P]enetration of ranibizumab into the retina is critical for its clinical use" and ranibizumab's "ability [to penetrate the retina] has been attributed to [its] small molecule size."). Regeneron cites the same prior-art evidence here. Trout Decl. ¶¶ 308, 364, 377. Consistent with its prior decision in the Mylan case, the Court finds here that the POSA would have been motivated to avoid increasing the molecular size

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

of aflibercept by using its glycosylated form.

Celltrion introduced one reference, Rosenfeld (ECF No. 142-5, Tessier Ex. 18), where researchers investigated in early clinical studies the use of intravitreal bevacizumab, a molecule with a larger molecular weight than aflibercept. Opp. 13. However, a reference introduced by Regeneron, Ferrara 2006 (ECF No. 108-9, Trout Ex. 21), comprehensively reviewed the ranibizumab, bevacizumab, and VEGF Trap literature, including Rosenfeld's research, and reported "skepticism specifically directed at intravitreal compositions comprising high molecular weight proteins such as VEGF Trap fusion proteins." Mylan, 2024 WL 382495, at *60; Trout Decl. ¶¶ 308, 364, 377; Ferrara 2006 at 862-63. Ferrara 2006 specifically cautioned against overreliance on the early findings reported in Rosenfeld, explaining that "[a]lthough intriguing, these early findings are difficult to compare with data from rigorous, double-masked, controlled phase 3 trials of verteporfin photodynamic therapy, pegaptanib, and, more recently, ranibizumab." Ferrara 2006 at 866. Ferrara 2006 observed that "it is noteworthy that initial, uncontrolled phase 1 or 2 studies with pegaptanib or verteporfin photodynamic therapy suggested a considerably greater benefit in AMD patients than that eventually demonstrated in randomized phase 3 studies, further

IN RE: AFLIBERCEPT PATENT LITIGATION                          1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

emphasizing the difficulty of interpreting early clinical results." Id. Thus, Rosenfeld does not overcome the repeated teachings in the prior art motivating the POSA against using a larger molecule for an ophthalmic formulation, which would have dissuaded the POSA from using glycosylated aflibercept. See Henny Penny Corp. v. Frymaster LLC, 938 F.3d 1324, 1332 (Fed. Cir. 2019) (the cited prior art "must be considered for all its teachings, not selectively").

Second, Celltrion argues that "favorable pharmacokinetics" of glycosylated aflibercept would motivate a POSA to use glycosylated aflibercept. Opp. 12. That argument also runs contrary to the prior art's teachings. The pharmacokinetics of glycosylated aflibercept that provide a longer half-life were only disclosed as favorable to treat cancer, by "extending in vivo half life" in the bloodstream. Holash at 11393-94 (ECF No. 108-9, Trout Ex. 27); Trout Decl. ¶ 379. By contrast, the prior art relating both to VEGF Traps and ranibizumab taught that, for ophthalmic use, "shorter serum half life" was desirable. Daly ¶ 43 (emphasis added); see also Mylan, 2024 WL 382495, at *6; Gaudreault at 731 ("The low circulating concentrations of ranibizumab after [intravitreal] administration may be important in the clinical setting, because VEGF is necessary for normal physiological

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

functions such as tissue repair and reproduction."). Both Regeneron's and Celltrion's expert witnesses agree that glycosylation lengthens serum half-life in the bloodstream. Trout Decl. ¶ 379, Tessier Tr. 198:7-14. Thus, the Court finds that the prior art would motivate a POSA against using glycosylated aflibercept in formulations for ophthalmic use.

Celltrion also attempts to use the inventor's own discovery as prior art, arguing that this Court found that "a longer half-life was advantageous since it allowed for smaller doses and less-frequent dosing." Opp. 13 (citing Mylan, 2024 WL 382495, at *14-15, *58-59). However, this finding was based on Regeneron's discovery that Eylea's long half-life unexpectedly facilitated extended dosing, not on any document that could properly be considered prior art in the obviousness analysis. See 35 U.S.C. § 103(a) (pre-AIA) ("Patentability shall not be negatived by the manner in which the invention was made."); Otsuka, 678 F.3d at 1296 ("The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight."). Indeed, this Court previously explained that "the law does not require the inventors to have appreciated that the Eylea composition they invented would become the success it is; 'understanding of the full range of an invention is not always achieved at the time of filing the patent

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

application,' and unexpected properties need not be appreciated at the time of the invention." Mylan, 2024 WL 382495, at *60 (quoting Knoll Pharm. Co. v. Teva Pharm. USA, Inc., 367 F.3d 1381, 1384-85 (Fed. Cir. 2004)).

Third, Celltrion argues that glycosylation may contribute to "binding affinity," Opp. 12, but does not direct the Court to any art to support this assumption. Daly taught that "[a]ffinity measurements showed that the non-glycosylated fusion polypeptides expressed in E. coli or the glycosylated polypeptides expressed in CHO cells had comparable binding affinity for VEGF as the full-sized parent trap." Daly ¶ 63. Dr. Trout examined this data, which was the only data comparing glycosylated and nonglycosylated VEGF traps, and came to the unrebutted conclusion that glycosylated and nonglycosylated aflibercept have comparable affinity. Trout Decl. ¶ 377. Dr. Tessier offered no contrary testimony and did not address these data. So, a POSA would not have been motivated to use glycosylated aflibercept on the basis of its comparative binding affinity.

Fourth, Dr. Tessier explained that glycosylation of aflibercept's "Fc" portion activates "effector functions," including immune-mediated toxicities. See Tessier Decl. ¶ 101 ("[G]lycosylation of the Fc region is important for IgG and Fc-

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

fusion protein binding to FcgRs, which results in various effector

functions, such as antibody-dependent cellular cytotoxicity (ADCC)

and complement-dependent cytotoxicity (CDC).”); Tessier Tr.

148:17-22; cf. Trout Decl. ¶¶ 362-63. In the context of ophthalmic

use, Daly taught that the “Fc” portion “may be modified to reduce

effector functions” by “eliminat[ing] glycosylation.” Daly ¶ 38.

Dr. Tessier did not dispute that, for ophthalmic use, an immune

response via glycosylation is undesirable, but did “not believe”

this concern “would outweigh the benefits of using a glycosylated

molecule.” Tessier Tr. 155:18-156:10, 169:22-170:12. Dr. Tessier

is not a physician, and he did not consult a physician to arrive

at his conclusion. Id. 170:7-12, 171:4-6 (agreeing that “it would

be logical to discuss with a medical professional” risks of

effector functions but noting that he had not had such a

discussion). His testimony on this point is undermined by the

testimony of Dr. Kay, another Celltrion expert who is a physician

and who has performed over 10,000 intravitreal injections. Kay

Tr. 15:7-10, 20:21-21:4. Dr. Kay stated “we certainly believe in

ophthalmology that the immune system plays a role in ocular

inflammation,” id., 60:18-61:22, and that ocular inflammation can

result in permanent vision loss, Id. 42:4-43:7, 44:17-45:14

(discussing “Jager 2004” reference). As a practicing physician,

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

Dr. Kay is better positioned than Dr. Tessier to opine on the concerns associated with clinical side-effects in patients. Dr. Kay's testimony, moreover, is consistent with this Court's prior finding in its obviousness analysis that "'moderate to severe' inflammation was an extremely concerning phenomenon for any intravitreal drug product to exhibit." Mylan, 2024 WL 382495, at *52. These immunological concerns would further motivate the POSA against using glycosylated aflibercept.

Finally, Celltrion argues that the POSA would have used glycosylated aflibercept for stability reasons. Opp. 12. Dr. Tessier identified no prior art that compared the stability of glycosylated and nonglycosylated aflibercept. Tessier Tr. 202:10-205:19. Moreover, Celltrion has not produced any prior art that teaches that glycosylation improves aflibercept's stability in the presence of a stabilizing agent and organic co-solvent, as required by '594 claim 5. Id. Further, '594 claim 5 depends from claim 3, which recites that "the VEGF trap is stable for at least 4 months" irrespective of glycosylation. Celltrion fails to provide a persuasive reason why stability concerns would motivate the POSA, beginning with a stable formulation from claim 5 of the ''594 patent, to glycosylate aflibercept.

Taken together, the evidence decisively points against a

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

motivation to glycosylate the VEGF trap claimed in '594 claim 5.
Thus, it would not have been obvious to the POSA to modify '594
claim 5 to arrive at the asserted claims of the Product Patent.

### 5. The Product Patent's "98% native conformation" claim limitation is not inherent in claim 5 of the '594 patent

Another difference between the asserted claims of the Product
Patent and '594 claim 5 is that the former requires "at least 98%
[or 99%, in claims 16 and 41] of the VEGF antagonist is present in
native conformation following storage at 5° C. for two months as
measured by size exclusion chromatography" whereas the latter
recites that "the VEGF trap is stable for at least 4 months." As
explained below, the Court concludes that the 98% native
conformation claim limitation is not inherent in the subject matter
claimed in '594 claim 5.

A missing claim limitation can be met for purposes of
anticipation or obviousness by showing that the limitation is
inherent in the reference claim. See PAR Pharm., 773 F.3d at 1194-
95. An inherent limitation, however, must be "necessarily
present," Apotex, 754 F.3d at 958, 960, and "may not be established
by probabilities or possibilities," Mylan, 2024 WL 382495, at *55
(quoting PAR Pharm., 773 F.3d at 1194). And in the context of
obviousness in particular, the Federal Circuit has explained that

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

the role of inherency is limited:  "the use of inherency in the context of obviousness must be carefully circumscribed because '[t]hat which may be inherent is not necessarily known' and that which is unknown cannot be obvious."  Honeywell, 865 F.3d at 1354 (quoting Rijckaert, 9 F.3d at 1534).  Thus, in order for the 98% native conformation claim limitation to be inherent in '594 claim 5, '594 claim 5 must necessarily and always meet the Product Patent's 98% native conformation claim limitation.  Apotex, 754 F.3d at 960; Glaxo, 52 F.3d at 1047.

Neither '594 claim 5 nor the shared specification of the '594 patent and the Product Patent discloses that a "stable" ophthalmic formulation within '594 claim 5 necessarily has 98% native conformation.  As described above, the patent describes that the "fusion protein is preferably substantially free of aggregates . . . [which] means that at least 90% of the weight of fusion protein is not present in an aggregate at the time the fusion protein is used to prepare the pharmaceutically effective formulation."  Product Patent, 6:50-55 (emphasis added).  As Dr. Tessier agreed, the patent thus teaches preparing a preferred formulation that has at least 90% protein in non-aggregated form. Tessier Tr. 35:20-36:14.  Also, because there is no dispute that the level of aggregation would not decrease after "the time the

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

fusion protein is used to prepare the . . . formulation" (as described further below), a "stable" ophthalmic formulation does not necessarily possess 98% native conformation as measured by SEC after two months storage. See Apotex, 754 F.3d at 960-61 (finding no inherency when the claimed property is sometimes, but not always, present in the anticipating reference); PAR Pharm., 773 F.3d at 1195-96 (noting the same rule applies to an obviousness reference).   This disclosure from the patents' common specification, together with the admission from Celltrion's expert, is sufficient for the Court to find that the 98% native conformation limitation is not inherent in the subject matter of '594 claim 5.

In its opposition to Regeneron's preliminary injunction motion, Celltrion relied on internal Regeneron data as evidence of inherency.[11]  In response, Regeneron pointed to other internal data showing that a specific aflibercept formulation did not have 98% native conformation even at time zero and before storage, and therefore would not meet the Product Patent claim limitation requiring at least 98% native conformation as measured by SEC after

---

[11] The parties do not dispute that such data may be considered in evaluating inherency.  See Hospira, Inc. v. Fresenius Kabi USA, LLC, 946 F.3d 1322, 1329-30 (Fed. Cir. 2020).

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

2 months.  Although not necessary to the Court's finding, this "SS195" data confirms that the 98% native conformation limitation is not inherent in '594 claim 5.  See Reply 7-8; Graham Decl. ¶ 11; SS-195 Stability Data (ECF No. 113-3, Trout Ex. 106 (corrected)). The SS195 data corresponds to an internal stability study performed by Regeneron on a formulation that falls within the scope of '594 claim 5 (40 mg/mL of aflibercept, 10 mM phosphate, 0.03% polysorbate 20, 5% sucrose, and 40 mM NaCl at pH 6.25), a fact that Celltrion does not dispute.  See Tessier Tr. 84:4-6 (agreeing that '594 claim 5 is not limited to any particular lot of aflibercept); Graham Decl. ¶ 10.  The formulation tested in the SS195 study possessed less than 98% native conformation by SEC even at time zero, before any storage.  Graham Decl. ¶ 11 (showing percent native conformation at time zero of 97.3, 97.7, and a value in between); SS-195 Stability Data. This data comports with the common disclosure in the Product Patent and the '594 patent stating that "preferably . . . at least 90% of the weight of fusion protein is not present in an aggregate at the time the fusion protein is used to prepare the pharmaceutically effective formulation." Product Patent, 6:50-55. And it also demonstrates that not every formulation falling within the scope of '594 claim 5 "necessarily" achieves 98% native conformation, as required for a finding of

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

inherency.  See Glaxo, 52 F.3d at 1047-48; PAR Pharm., 773 F.3d at

1195-96.

Celltrion does not meaningfully dispute that a formulation

starting with less than 98% native conformation could not possess

98% native conformation after 2 months' storage.  In its motion to

strike Dr. Graham's testimony (discussed below), Celltrion points

out that the Product Patent claims do not recite an "initial

purity" requirement.  Memo. re Mot. to Strike at 3 (ECF No. 160-

3).  While that is true, it is ultimately irrelevant to the

relevant question whether the composition in SS195 meets the claims

of the Product Patent, which require at least 98% native

conformation as measured by SEC after two months.  That is because

the evidence demonstrates that the process of protein aggregation

is irreversible, so that the percent native conformation will be

the same or lower after two months' storage, as compared to time

zero.  Celltrion's expert, Dr. Tessier, did not dispute this

proposition, Tessier Tr. 31:16-32:9; and in fact, he relied upon

it in his declaration, Tessier Decl. ¶ 52 n.2 ("[D]ata for 1 and

3 months of 99.2 and 99.1 % monomer, respectively, would imply

that at 2 months, the % monomer would be between these values.").

Regeneron's expert, Dr. Trout, likewise explained that aggregation

is irreversible.  Trout Decl. App. A ¶ 61 ("[I]f the percentage

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

native conformation is greater than 98% at 3 months, then it must necessarily have been greater than 98% after 2 months."). This finding is consistent with the Court's prior finding that the process of aggregation is irreversible. Mylan, 2024 WL 382495, at *32. Thus, because the SS195 data, consistent with the '594 and Product Patent specification, demonstrates that a formulation falling within the scope of '594 claim 5 can have less than 98% native conformation by SEC at time zero, it also demonstrates that a formulation falling within the scope of '594 claim 5 can have less than 98% native conformation by SEC following storage for 2 months at 5°C. These data confirm the Court's finding that the 98% native conformation limitation of the Product Patent claims is not inherent in '594 claim 5, because formulations falling within the scope of '594 claim 5 do not necessarily meet the at least 98% native conformation claim limitation. Glaxo, 52 F.3d at 1047-48; PAR Pharm., 773 F.3d at 1195-96.

Celltrion points to other data, from Examples 3 and 4 of the '594 patent, in which a composition falling within the scope of '594 claim 5 exhibited at least 98% native conformation. Opp. 8. As an initial matter, Celltrion incorrectly equates Examples 3 and 4 with '5*94 claim 5. Opp. 8-9. Examples 3 and 4, as well as Eylea itself, are specific compositions that are not prior art.

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

See Eli Lilly, 689 F.3d at 1380 (explaining that the "double patenting analysis . . . turns on an evaluation of what [the patentee] has claimed, not what it has disclosed" and requires "[p]utting aside the teachings in the [] patent's specification"). There is no dispute that Eylea was not sold until well after the 2006 priority date of the Product Patent and is not prior art. And while these Examples (and Eylea) are embodiments of '594 claim 5, that claim is not limited to those embodiments.  To the contrary, "although the specification often describes very specific embodiments of the invention, [the Federal Circuit] ha[s] repeatedly warned against confining the claims to those embodiments." Phillips, 415 F.3d at 1319-20.  Notably, '594 claim 5 is not limited to any lot of aflibercept, or any particular glycosylation pattern of aflibercept, and recites a range of pH values, and Celltrion has failed to present persuasive evidence how or why the POSA would be motivated to obtain the specific examples in the patent specification or Eylea, which are not prior art.

For example, '594 claim 5 recites a pH range of "pH 6.2-6.4," whereas Examples 3 and 4 are limited to "pH 6.3." Compare '594 Patent at claim 5 with id. at 8:55-63, 9:15-24.  Celltrion's own expert could not identify a reason that the POSA would select the

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

pH of 6.3 recited in Examples 3 and 4 from the broader genus of pH
6.2-6.4 that is recited in '594 claim 5.  Tessier Tr. 116:5-11.
Thus, although Examples 3 and 4 both meet the 98% native
conformation limitation, both examples are limited to formulations
having a pH of 6.3; these examples do not correspond to
formulations with "pH 6.2-6.4" as recited in '594 claim 5.[12]
Celltrion cites no percent native conformation data for
formulations at pH 6.4 and provides no evidence that a '594 claim
5 formulation at pH 6.4 necessarily has 98% native conformation.
Nor does Celltrion identify a reason why the POSA practicing '594
claim 5 would select any particular pH within the claimed range or
exclude formulations at pH 6.4, which is expressly recited in '594
claim 5.  Dr. Tessier admitted that he did not "consider the pH
sensitivity of aflibercept as part of this matter." Id., 117:21-
118:7.  Dr. Tessier also refused repeatedly to testify that
practice of '594 claim 5 at pH 6.4 necessarily would have 98%
native conformation, asserting instead that he had no reason to
doubt that it would.  Id., 118:8-124:21.  This probabilistic

---

[12] Celltrion argues that "[e]xamples 3 and 4 of the specification
also show that the pH of Eylea varied from pH 6.2-6.4 during
testing." Opp. 8.  However, there is no native conformation data
for the formulation at the time when it reached a pH of 6.4. '594
Patent at Examples 3, 4; Tessier Tr. 116:12-117:20.

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

evidence cannot prove inherency.  Apotex, 754 F.3d at 960-61.

Because the pH of 6.3 in the patent's examples is not prior art, it cannot be relied upon for obviousness — both because "[o]bviousness cannot be predicated on what is unknown," In re Rijckaert, 9 F.3d at 1534, and because the '594 patent's specification "does not qualify as prior art" in ODP, Eli Lilly, 689 F.3d at 1379.  Without any prior art basis to select the pH in the examples to meet the Product Patent claims, Celltrion's ODP defense fails.  In re Kaplan, 789 F.2d 1574, 1580 (Fed. Cir. 1986).

In any event, Celltrion's reliance on the native conformation data in Examples 3 and 4 is legally inadequate to prove inherency. That the practice of '594 claim 5 sometimes results in 98% native conformation is insufficient; inherency requires that the 98% native conformation limitation be present necessarily, not just possibly or probably.  The Federal Circuit's Glaxo v. Novopharm precedent is instructive.  Glaxo, 52 F.3d at 1043.  There, the patent challenger argued that a claimed crystal was inherent from a prior art process because "experts performed the process disclosed in [the prior art] thirteen times and each time they made" the claimed crystal ("Form 2").  Id. at 1047.  But the Court held that was not sufficient to show inherency because two other times the prior art process was performed, and the claimed crystal

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

did not form.  Id. at 1047-48 ("Glaxo's David Collin originally
made Form 1 by practicing [the prior art process],
and . . . Glaxo's expert, Nicholas Crouch, did too."); see also
Apotex, 754 F.3d at 960-61 (finding no inherent anticipation when
"it was at least possible" to perform the prior art process in a
way that does not result in the asserted claim) (emphasis in
original); PersonalWeb Techs., LLC v. Apple, Inc., 917 F.3d 1376,
1382 (Fed. Cir. 2019) ("[M]ere possibility is not enough" for
inherency).  The facts of Glaxo are materially indistinguishable
from the ones here, as the evidence demonstrates that '594 claim
5 compositions may well achieve the 98% native conformation
limitation (as in Example 4 of the patent) but they also may not
(as in SS195) and the formulations referenced in the specification
having 90% or less than 90% protein in non-aggregate form at the
time of preparation), and in other instances there is simply no
evidence one way or the other whether compositions would
necessarily achieve 98% native conformation (as with a pH of 6.4).
The same result as Glaxo thus applies here as well:  98% native
conformation as claimed in the Product Patent is not inherent.

The Court has also considered the Federal Circuit's decision
in Hospira, Inc. v. Fresenius Kabi USA, LLC, 946 F.3d 1322 (Fed.
Cir. 2020), and concludes that it does not support a finding of

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

inherency.  There, the Federal Circuit upheld an enablement finding where it "relied on fact and expert testimony regarding the stability data for more than 20 tested samples . . . , all of which met the [claim limitation]."  Id. at 1327, 1330-31.  Here, in contrast, all of the formulations within the scope of the reference claim do not meet the 98% native conformation limitation, as demonstrated by both the specification itself and the internal Regeneron data.  Celltrion therefore has failed to establish evidence that compositions within claim 5 necessarily possess the 98% native conformation limitation.

Finally, the Court notes that a patent challenger like Celltrion who argues invalidity on a basis already addressed during prosecution bears "the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job."  See PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1304 (Fed. Cir. 2008) (internal quotation omitted).  The Court's conclusion that the 98% native conformation claim limitation is not inherent in the subject matter claimed in '594 claim 5 is consistent with the Examiner's prior determination of this issue, and Celltrion has not met its burden of

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

demonstrating a substantial question of invalidity.[13]

The Court further notes that patent office issued interim decisions as to a related patent, U.S. Patent 10,464,992 (ECF No. 108-11, Trout Ex. 64), to institute reexamination and inter partes review. See Celltrion, Inc. v. Regeneron Pharms., Inc., 2023 WL 5166828 (P.T.A.B. July 20, 2023). It is undisputed that Regeneron later disclaimed the '992 patent. However, Regeneron does not assert the '992 patent here and the Court does not find that the interim patent office decisions as to the '992 patent undermine the Product Patent asserted here. Notably, the '992 patent claims do not require 40 mg/mL of aflibercept and are silent as to whether aflibercept is glycosylated. The significant differences in the scope of the '992 patent and Product Patent claims and the preliminary nature of the decisions render them at most tangentially relevant and insufficient to support inherency or undermine the Examiner's conclusions regarding the Product Patent.

For all of these reasons, the Court finds that the 98% native conformation limitation of the Product Patent claims is not

---

[13] Celltrion argues that the Examiner's judgment is irrelevant because Regeneron did not specifically direct the Examiner to Examples 3 and 4. Opp. 9. But the specification was of course before the Examiner, see PowerOasis, 522 F.3d at 1304, and Celltrion in any event fails to establish that '594 claim 5 is limited to Examples 3 and 4, as discussed further below.

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

inherent in '594 claim 5.

After submitting its Opposition, Celltrion has also argued that even if not inherent, the 98% native conformation limitation would have been obvious. Reply re Mot. to Strike (ECF No. 169-1 at 3, 11-12). Celltrion waived this argument by not relying on it in its Opposition. Regardless, Dr. Trout has provided testimony that the POSA beginning with claim 5 of the '594 patent would not have been motivated to achieve the 98% native conformation limitation and would not have had a reasonable expectation of achieving that level of native conformation after two-months' storage. Trout Decl. ¶¶ 339-40, 385-87, 390. Celltrion did not rebut that evidence. Dr. Trout further explained that no prior art relied on by Celltrion teaches native conformation levels of aflibercept (Trout Decl. ¶¶ 339-40), that the POSA would not have been motivated to obtain such a high level of native conformation as lower levels would have been considered acceptable (Trout Decl. ¶¶ 385-87), and that even if the POSA did possess such motivation, the POSA would not have reasonably expected to obtain 98% native conformation after two-months' storage given the absence of any relevant prior art teachings as to aflibercept's stability, Trout Decl. ¶¶ 339-40, 390; see Mylan, 2024 WL 382495, at *56 ("Dr. Trout explained that because fusion proteins are synthetic

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

'Frankenstein' molecules that, unlike antibodies, did not evolve to possess inherent stability, the POSA would expect fusion proteins like aflibercept to have lower stability than antibodies . . . ."). There does not appear to be any dispute that "[j]ust because one protein has a given native conformation at a specific condition, the [POSA] wouldn't expect that a different protein will have the same native conformation at that condition," consistent with the Court's prior finding. Mylan, 2024 WL 382495, at *56 (alternations in original) (emphasis removed). The Court thus credits Dr. Trout's testimony that the 98% native conformation limitation would not have been obvious. Celltrion's generic argument that the POSA would have sought to purify aflibercept fails to present a substantial question of invalidity.

### 6. Celltrion's motion to strike portions of Regeneron's reply brief and the Graham declarations [ECF No. 160-2]

Pending before the Court is a motion to strike or, in the alternative, for leave to file a surreply by Celltrion, Inc. ("Celltrion") [ECF No. 160-2]. Upon consideration, the Court finds good cause to **GRANT** the motion inasmuch as it requests leave to file a sur-reply. The proposed surreply [ECF No. 160-4] is deemed **FILED** and is considered herein. To the extent Celltrion

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

asks the Court to strike Regeneron's submission, the Court **DENIES**
Celltrion's motion.  Despite Regeneron's request, Celltrion did
not disclose to Regeneron in advance of Regeneron's preliminary
injunction motion the fact that Celltrion intended to argue
inherency as part of its ODP theory, and Celltrion bears the burden
on invalidity at the preliminary injunction stage.  See Regeneron
Opposition, ECF No. 166 at 7-8, 11-14; BlephEx, 24 F.4th at 1399.
Thus, Regeneron's preliminary injunction reply was its first
opportunity to respond to the ODP inherency arguments raised for
the first time in Celltrion's preliminary injunction opposition.
The Court also finds that Regeneron's reply arguments and the
Graham declaration do not prejudice Celltrion, as Celltrion could
have — but chose not to — address the SS195 data in its opposition,
and its expert declined to offer testimony about SS195 when asked
about it at his deposition.  ECF No. 166 at 15.

Even if Celltrion's motion to strike were granted, the Court
would come to the same conclusion that the 98% limitation in not
inherent in '594 claim 5.  Celltrion had the burden to present a
substantial question of ODP based on its assertion that the 98%
limitation is inherent in '594 claim 5, BlephEx, 24 F.4th at 1399,
contrary to the Examiner's finding.  The SS195 formulation and
data were in the record independent of Regeneron's reply brief or

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

the Graham declaration.  Trout Decl. ¶ 235.  Dr. Trout cited these materials in the paragraph directly following a paragraph about the formulation and testing that led to Examples 3 and 4, which Celltrion cited to support its argument that "Regeneron's own internal stability testing confirms" that "the stability limitations of the Asserted Claims are not patentable improvements over the Eylea formulation of claim 5." Opp. 8 (citing Trout Decl. ¶ 234).  While Celltrion focuses exclusively on the internal data where a '594 claim 5 formulation met the 98% limitation, the Court may not cherry-pick that data while ignoring the same type of data in SS195 for a formulation that did not achieve 98% native conformation.  See Glaxo, 52 F.3d at 1047-48.

Even were the data from SS195 not considered, Celltrion still does not present a substantial question that '594 claim 5 necessarily meets the 98% native conformation limitation.  As discussed above, Celltrion's reliance on limited examples from the patent specification that meet the 98% native conformation limitation is not sufficient to show that practicing '594 claim 5 results in the 98% native conformation limitation being met each and every time, as inherency requires.  The patent specification makes clear that less than 98% native conformation is acceptable, and in fact preferable, for the "stable" formulation of '594 claim

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

5. <u>See</u> Product Patent, 6:50-55 ("[The] fusion protein is preferably substantially free of aggregates . . . [which] means that <u>at least 90%</u> of the weight of fusion protein <u>is not present in an aggregate</u> at the time the fusion protein is used to prepare the pharmaceutically effective formulation."). And as discussed above, Celltrion provides no evidence that a '594 claim 5 formulation at pH 6.4 and irrespective of glycosylation necessarily has 98% native conformation. Thus, Celltrion's inherency argument does not raise a substantial question of validity as to any asserted claim of the Product Patent.

**7. No motivation to change a PFS to a vial.**

Celltrion argues that a POSA would be motivated to replace the PFS of '594 claim 5 with the vial recited in asserted claims 4, 7, 9, 11, and 14-17 of the Product Patent. Opp. 14. Here too, Celltrion does not meet its burden to show a substantial question of validity.

As stated previously, obviousness addresses what is, "on balance, desirable," not what is "feasible," <u>Winner</u>, 202 F.3d at 1349; <u>Orexo</u>, 903 F.3d at 1272-73. And contrary to Celltrion's suggestion, the evidence need not rise to the level of teaching away to defeat the showing of motivation to modify the claim. <u>Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.</u>, 876 F.3d

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

1350, 1363 (Fed. Cir. 2017).  Celltrion cites evidence that "[t]he prior art disclosed drug products available in both vial and PFS presentations."  Opp. 14 (citing Tessier ¶¶226-32).  However, merely showing that a modification is possible does not show that such a modification is desirable and is thus insufficient to prove obviousness.  Celltrion also argues that "[d]octors would have found both formats to be useful," id., but that does not support replacing a PFS with a vial.  Dr. Trout cited the prior art's teaching that the "most preferred" dosage form for a therapeutic protein product was "a solution formulation that is typically stored in the refrigerator and preferably in a pre-filled syringe."  Trout Decl. ¶ 393 (citing Trout Ex. 40 (Nayar 2002) at 183-184).  Dr. Tessier did not dispute this or address the teaching in Nayar 2002.  And Celltrion's argument is further undermined by testimony from Celltrion's own expert in packaging technologies, Dr. Kiang.  In her deposition, Dr. Kiang agreed that a PFS "is much easier for the user," Kiang Tr. (ECF No. 157-3 Ex. 4) 44:21-45:3, and testified that "I don't get it" why a manufacturer would go from a stable PFS to a vial, id. at 58:12-59:9.  Thus, Celltrion has not presented sufficient evidence to raise a substantial question of ODP based on the POSA's motivation to modify the PFS of '594 claim 5 to the vial claimed in the Product Patent, and thus has

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

not raised a substantial question that the vial recited in asserted claims 4, 7, 9, 11, and 14-17 of the Product Patent is obvious over the PFS of '594 claim 5.

### 8. Objective evidence supports nonobviousness

Objective evidence must be considered before concluding that a claim is obvious. In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1079 (Fed. Cir. 2012). Objective evidence supports the Court's holding that Celltrion has failed to raise a substantial question that the asserted claims of the Product Patent are obvious over '594 claim 5. Dr. Trout explained in his declaration that "[t]here was significant industry skepticism both towards VEGF Trap molecules and using VEGF Trap molecules in the eye," "[t]he efficacy of EYLEA as an intravitreal injection demonstrated unexpected properties," and that "evidence of copying supports the nonobviousness of the [Product Patent's] Asserted claims." Trout Decl. ¶ 361-69, 416. The Court credits Dr. Trout's opinion, relying on the same evidence addressed at Mylan, and concludes, as in Mylan, that objective evidence strongly supports nonobviousness here as well. See Mylan, 2024 WL 382495, at *59-60.

Celltrion argues that the evidence from Dr. Trout is flawed because he "did not consider whether his secondary evidence had

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

the required nexus to the differences between" '594 claim 5 and
asserted claims of the Product Patent. First, Celltrion cites no
authority holding that objective evidence must be tied to the
differences between the asserted claims and the reference claims.
To the contrary, the Federal Circuit has held that objective
evidence may be "probative of nonobviousness even if it was not
precisely limited to the point of novelty of the claimed
combination." Henny Penny, 938 F.3d at 1334. While "the
identified objective indicia must be directed to what was not known
in the prior art, . . . 'what was not known in the prior
art . . . may well be the novel combination or arrangement of known
individual elements.'" Id. at 1333 (quoting Novartis AG v. Torrent
Pharm. Ltd., 853 F.3d 1316, 1331 (Fed. Cir. 2017)). Dr. Trout
explained, and the parties do not appear to dispute, that Eylea is
an embodiment of the asserted claims. Accordingly, "there is a
presumption of nexus for objective considerations when the
patentee shows that the asserted objective evidence is tied to a
specific product and that product is the invention disclosed and
claimed in the patent." WBIP, 829 F.3d at 1329 (internal quotation
omitted); see also Immunex Corp. v. Sandoz Inc., 964 F.3d 1049,
1067 (Fed. Cir. 2020) ("Nexus is appropriately presumed in this
case where the court concluded that the claims are directed to the

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

active ingredient in [the patentee's biologic product] and its
method of manufacture."). Nexus can be presumed in this case,
because Regeneron has shown that the objective evidence is tied to
Eylea, and Eylea is an embodiment of the asserted claims in the
Product Patent.

Moreover, even if the specific differences between the claims
of the Product Patent and '594 claim 5 were relevant, the Court
still finds that the objective evidence would weigh in favor of
nonobviousness. Unlike the claims of the '594 patent, the Product
Patent claims require that aflibercept is glycosylated (as in
Eylea) and that the composition meets the 98% native conformation
limitation. As this Court found in Mylan, and the current record
reflects, "the stability of the claimed compositions, including
the required 98% native conformation, indicated to the POSA that
the 'there's a relatively lower risk of inflammation'" as compared
to a formulation with lower native conformation (and thus more
protein aggregates). Mylan, 2024 WL 382495, at *60; Trout Decl.
¶ 369.

Even without objective evidence of nonobviousness, the Court
would find that Celltrion has not raised a substantial question
that the Product Patent is invalid for ODP. See AstraZeneca AB v.
Aurobindo Pharma Ltd., 232 F. Supp. 3d 636, 649 n.8 (D. Del. 2017)

PageID# 20735

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

("Because Aurobindo has failed to establish a prima facie case of obviousness, the court does not address AstraZeneca's secondary considerations."); Takeda Pharm. Co. v. Handa Pharm., 2013 WL 9853725, at *66 (N.D. Cal. Oct. 17, 2013) ("[T]he absence of secondary considerations does not prove obviousness."). Nevertheless, as explained, the available objective evidence, taken together with the other evidence of record, supports the Court's conclusion that Celltrion has failed to raise a substantial question that the asserted claims of the Product Patent are obvious over '594 claim 5.

### 9. Written Description

Celltrion argues that the Product Patent's asserted claims are invalid for lack of written description because the claim language "at least 98%" denotes a range of 98%-100%, but the highest percent native conformation disclosed in the Product Patent's specification is 99.2%. Opp. at 16-17. The Court disagrees and concludes that Celltrion fails to demonstrate a substantial question of invalidity based on lack of written description. This holding is consistent with the Court's holding in Mylan. See Mylan, 2024 WL 382495, at *64, 66 (crediting Dr. Trout's analysis and conclusion that "all of the Product Patent's examples have 'at least 98 percent native conformation as measured

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

by SEC after two months'" and that the Product Patent provided

"adequate written description for the asserted claims").

The specification need not describe "every conceivable and

possible future embodiment of [the] invention." Cordis Corp., 339

F.3d at 1365.  Open-ended claims, such as the "at least" claim

here, "may be supported if there is an inherent, albeit not

precisely known, upper limit and the specification enables one of

skill in the art to approach that limit." Andersen Corp. v. Fiber

Composites, LLC, 474 F.3d 1361, 1376-77 (Fed. Cir. 2007) (quoting

Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565,

1572 (Fed. Cir. 1991)).  "At least" claims are ubiquitous in

pharmaceutical patents.[14]  Celltrion's expert Dr. Tessier stated

---

[14] Patents with "at least" claims related to purity have frequently
been litigated without a finding that the patent is invalid or
requiring examples that reach 100% purity.  See Glaxo Grp. Ltd. v.
Apotex, Inc., 376 F.3d 1339, 1343 (Fed. Cir. 2004) ("Cefuroxime
axetil in amorphous form essentially free from crystalline
material, and having a purity of at least 95% aside from residual
solvents."); Cipla Ltd. v. Sunovion Pharms. Inc., 174 F. Supp. 3d
869, 871 (D. Del. 2016) ("[p]ure and isolated Levalbuterol L-
tartrate having an enantiomeric excess of at least 95%"); United
Cannabis Corp. v. Pure Hemp Collective Inc., 2019 WL 1651846, at
*2 (D. Colo. Apr. 17, 2019) ("[E]very independent claim describes
'[a] liquid cannabinoid formulation, wherein at least 95% of the
total cannabinoids is' a specified cannabinoid or combination of
them."); Mylan Institutional LLC v. Aurobindo Pharma Ltd., 2016 WL
7587325, at *7 (E.D. Tex. 2016) ("A compound N-[4-[[4-(diethyl
amino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-
1-ylidene]-N-ethylethanaminium, sodium salt having a purity of at

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

─────────────────────────────────────────────────────

that the absolute upper limit of the "at least" limitation at issue here is, at most, 100%. See Tessier ¶ 339 ("[I]n my opinion, the language 'at least' denotes a range starting at the recited value and going as high as 100%"). Dr. Tessier also testified that practically, "most proteins are not purified to [100%]." Tessier Tr. 210:21-22. Thus, the maximum percent native conformation "would be limited by what a person skilled in the art would understand to be workable," which here would be somewhat less than 100% (the theoretical maximum). Ralston Purina Co. v. Far-Mar-Co., 772 F.2d 1570, 1576 (Fed. Cir. 1985); see also FS.com Inc. v. Int'l Trade Comm., 65 F.4th 1373, 1376 (Fed. Cir. 2023) (finding the inherent upper limit to be the limit of what was technologically feasible). As stated in Andersen, the inherent upper limit need not be precisely known provided it can be shown that an inherent upper limit exists. 474 F.3d at 1376-77.

Open-ended claims, such as the "at least" claim here, need not be supported by an embodiment at that upper limit; the patent need only "enable[] [the POSA] to approach that limit." Andersen, 474 F.3d at 1377. For example, in Andersen, the patent recited an open-ended claim — "a Young's modulus rating of greater than

─────────────

least 99.0% by HPLC.").

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

500,000." Id. at 1376. At trial, the evidence showed that "the inventors did not obtain results with a modulus value of greater than 1.2 million." Id. However, the Court held that there was adequate written description because "a person of skill in the art would recognize that the upper limit of the Young's modulus of the structural member would lie somewhere between the Young's modulus of the wood fiber and that of the polymer used in the composition." Id. Thus, although the results did not reach the upper limit (which was not numerically defined), the Court held that written description was satisfied because the disclosure allowed the POSA "to approach that limit." Id. The Federal Circuit's other relevant precedent is consistent. For example, in Nalpropion Pharms., the claims recited "at least 99%" dissolution within a certain time, and the Federal Circuit upheld written description despite citing no results between 99-100%. 934 F.3d at 1349, 1351; see also Ralston Purina, 772 F.2d at 1576 (finding written description support for claims of "at least 25% by weight" despite no disclosure of 100% by weight); FS.com, 65 F.4th at 1375-77 ("at least [98] fiber optic connections per U space" enabled despite no disclosures between 98 and upper limit of 144 connections per U space).

Under the Federal Circuit's standard, the Court finds that

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

the Product Patent's specification amply supports the claim reciting "at least 98%" native conformation. In his declaration, Dr. Trout explained that the Product Patent includes eight examples representative of the genus, each of which "achieved 98% or greater native conformation over two months storage as measured by size exclusion chromatography." Trout Decl. ¶¶ 450-51. More specifically, the results in the patent show between 98.5 and 99.2% native conformation for the liquid formulations tested after storage for 2-3 months. Id.; Product Patent, Tables 1-6. This led Dr. Trout to the conclusion that "the specification teaches the POSA representative formulations with the claimed elements and possession of the claimed genus." Trout Decl. ¶ 451. The Court credits Dr. Trout's analysis and conclusion, as it did in Mylan. Mylan, 2024 WL 382495, at *64. The Product Patent's multiple disclosures of native conformations less than 1% shy of 100% (the absolute upper limit for the claim term, which "in general" is not met for proteins, Tessier Tr. 210:4-211:2) meets the Federal Circuit's standard. See Product Patent, Table 3 (99.2% native conformation at 2 months), Table 4 (99.1% native conformation at 2 months); Andersen, 474 F.3d at 1377.

The two cases Celltrion relies on are inapposite. Not only did neither case involve an open-ended claim, the specification

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

disclosures in the two cases cited by Celltrion bear no resemblance to the specification here. In Indivior UK Ltd. v. Dr. Reddy's Labs. S.A., the patent claimed a range of "about 40 wt % to about 60 wt %," but the specification disclosed neither endpoint. 18 F.4th 1323, 1328 (Fed. Cir. 2021). The only disclosures in the specification that explicitly fell within the claimed range were a disclosure of "at least 25%", which the Court notes is "quite out of the [claimed] range," and a disclosure of "at least 50%," which the Court found to be "hardly clear support in light of other inconsistent language." Id. at 1329. The Court also rejected the post hoc attempt to "select several components [in the example tables], add up the individual values, determine the aggregate percentages, and then couple those aggregate percentages with other examples" to arrive at the claimed range. Id. at 1329. But no such post-hoc rationalization is necessary here: the Product Patent claims "at least 98%" native conformation, and 98% is simply the highest whole number achieved in each example (all of which met the claim limitation).

The patent at issue in the nonprecedential opinion, Columbia Ins. Co. v. Simpson Strong-Tie Inc., 2023 WL 2733427 (Fed. Cir. Mar. 31, 2023), had the opposite problem as the patent in Indivior. The patent in Columbia claimed a range, but the specification only

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

disclosed the lower bound of the range.  2023 WL 2733427 at *4-5.

There was no disclosure of any other number within the range and

there was nothing in the specification to suggest to a POSA that

the inventors possessed anything other than the exact lower bound

of their invention.  Id.  As previously noted, the Product Patent

contained multiple disclosures of native conformations throughout

the range of 98% to 100%.  Unlike in Columbia, it is clear to a

POSA reading the Product Patent that inventors possessed the

entirety of the claimed subject matter as required under Andersen.

In sum, the Court holds that Celltrion has not raised a

substantial question of invalidity due to a lack of written

description with respect to any asserted claim of the Product

Patent.  Because Celltrion does not raise any arguments addressed

to any limitation other than the 98% native conformation limitation

recited in claims 1 and 26, there is no substantial question as to

the Product Patent Asserted Claims (which all depend from claims

1 or 26 and are thus narrower than those claims).

### D. Irreparable Harm

Regeneron "must make a clear showing that [they are] at risk

of irreparable harm, . . . which entails showing a likelihood of

substantial and immediate irreparable injury."  See Apple, Inc. v.

Samsung Electronics Co., 678 F.3d 1314, 1325 (Fed. Cir. 2012)

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

(Apple I) (internal quotation marks omitted). The patentee must also establish that the harm is related to the infringement, a requirement referred to as the "causal nexus" requirement. Id. at 1324.

"Irreparable injury encompasses different types of losses that are often difficult to quantify." Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336, 1344 (Fed. Cir. 2013). Accordingly, courts recognize multiple types of irreparable harm. See, e.g., Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930-31 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

The evidence shows that Regeneron would experience irreparable injury if Celltrion launches CT-P42. Harm from the infringing product's competition for the same customers "is not speculative." Trebro Mfg., Inc. v. Firefly Equip., LLC, 748 F.3d 1159, 1170 (Fed. Cir. 2014).

### 1. Loss of Sales and Market Share

A showing of lost market share and sales can support a finding of irreparable harm. See Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1154 (Fed. Cir. 2011).

In particular, the prospect of direct competition from an

IN RE: AFLIBERCEPT PATENT LITIGATION PageID#8743                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

infringing competitor "strongly shows a probability for irreparable harm." See Trebro Mfg., 748 F.3d at 1170-71 (recognizing a strong "probability for irreparable harm" where an alleged infringer "is a direct competitor" and explaining that "the district court's blanket dismissal of evidence showing likely loss of market share and loss of access to customers was an error of law") (internal quotation marks omitted). "Loss of market share constitutes irreparable injury because market share is so difficult to recover. . . . Moreover, [t]he right to exclude direct competition in a limited sphere, a right inherent in the grant of a patent, is irreparably harmed by the loss of sales and the competitive foothold that the infringer will gain." Indivior Inc. v. Dr. Reddy's Lab'ys S.A., 2018 WL 3496643, at *12 (D.N.J. July 20, 2018) (internal quotation marks omitted), vacated on other grounds, 752 F. App'x 1024 (Fed. Cir. 2018); see also Abbott Lab'ys v. Sandoz, Inc., 544 F.3d 1341, 1361-62 (Fed. Cir. 2008) (holding that "precedent supports" recognizing "market share and revenue loss" as irreparable harms if the infringer enters the market "while the litigation proceeds").

"Where two companies are in competition against one another, the patentee suffers the harm — often irreparable — of being forced to compete against products that incorporate and infringe

IN RE: AFLIBERCEPT PATENT LITIGATION744                          1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

its own patented inventions." Douglas Dynamics, 717 F.3d at 1345
(reversing denial of permanent injunction); see also Presidio
Components, 702 F.3d at 1363 ("Direct competition in the same
market is certainly one factor suggesting strongly the potential
for irreparable harm without enforcement of the right to
exclude.").

The likelihood of irreparable harm increases in cases
involving markets with few competitors. See Lonza Walkersville,
Inc. v. Adva Biotech., Ltd., 581 F. Supp. 3d 736, 750 (D. Md. 2022)
("Given the size and nature of the relevant market . . . a sale of
[the infringing product] would quite likely be a lost sale for
[the patentee]."), appeal dismissed, 2022 WL 1634221 (Fed. Cir.
May 24, 2022). But irreparable harm from direct competition often
exists even when there are multiple competing products. See, e.g.,
ePlus, Inc. v. Lawson Software, Inc., 2011 WL 2119410, at *7, 9
(E.D. Va. May 23, 2011) (finding irreparable harm when there are
at least eight "companies that compete in the market"), modified,
946 F. Supp. 2d 459 (E.D. Va. 2013), vacated on other grounds, 760
F.3d 1350 (Fed. Cir. 2014); SynQor, Inc. v. Artesyn Techs., Inc.,
2011 WL 238645, at *1, *3 (E.D. Tex. Jan. 24, 2011) (finding
irreparable harm when there were 11 competitors); Callaway Golf
Co. v. Acushnet Co., 585 F. Supp. 2d 600, 619-21 & n.22 (D. Del.

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

2008) (finding irreparable hard when there were 17 competitors), aff'd in part, vacated in part on other grounds, 576 F.3d 1331 (Fed. Cir. 2009).

Harm from competition is not limited to harm to products that practice the patent. It exists whenever products are "competing for the same customers in the same markets," Presidio Components, 702 F.3d at 1363, or when products "meet the same needs," Broadcom Corp. v. Emulex Corp., 2012 WL 13036855, at *3 (C.D. Cal. Mar. 16, 2012), aff'd, 732 F.3d 1325 (Fed. Cir. 2013). Indeed, a patentee can establish irreparable harm even if "it does not currently practice the claimed inventions" at all. Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 703 (Fed. Cir. 2008); see also Presidio Components, 702 F.3d at 1363 ("Even without practicing the claimed invention, the patentee can suffer irreparable injury.").

The Court concludes that Regeneron will likely be irreparably harmed by the entry of the biosimilar CT-P42 because Regeneron will be "forced to compete against products that incorporate and infringe its own patented inventions." Douglas Dynamics, 717 F.3d at 1345; see also Abbott Lab'ys, 544 F.3d at 1361-62.

There are only a handful of anti-VEGF medications currently on the market to treat angiogenic eye disorders, Clark Decl. ¶ 6,

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

and Celltrion does not dispute that Regeneron's Eylea products are the only anti-VEGF medications with aflibercept. See Malackowski Decl. ¶ 35 (ECF No. 142-12) (listing the currently available "anti-VEGF ophthalmic biologics," of which only Eylea and Eylea HD are aflibercept medications). While other medications exist that treat the same conditions as Eylea, Regeneron has presented testimony that those medications are clinically inferior to Eylea in certain respects. Clark Decl. ¶ 7; Mylan Trial Tr. 172:16-21 (Yancopoulos), Regeneron Pharms., Inc. v. Mylan Pharms., Inc., No. 22-cv-61-TSK (N.D.W. Va. June 12, 2023), ECF No. 558; id. at 309:13-20 (Csaky) ("[Ophthalmologists] all kind of believe that Eylea still is the best anti-VEGF agent out there."); Id. 861:24-862:4 (Albini) (discussing the safety issues with Beovu).

For example, Lucentis, the leading treatment for angiogenic eye disorders before Eylea's launch, must be dosed monthly, compared to Eylea's extended dosing interval of every eight weeks. Mylan Trial Tr. 123:15-124:5 (Yancopoulos). Other medications come with safety concerns or result in patients gaining less visual acuity than similarly situated patients taking Eylea. Clark Decl. ¶ 7. Eylea is thus the preferred treatment of many ophthalmologists. See, e.g., id.; Mylan Trial Tr. 1917:12-1918:2 (Csaky), Regeneron Pharms., Inc. v. Mylan Pharms., Inc., No. 22-

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

cv-61-TSK (N.D.W. Va. June 22, 2023), ECF No. 568; see also id. at

172:16-21 (Yancopoulos) (Eylea viewed as the "gold standard").

The evidence shows that if an aflibercept biosimilar

launches, healthcare providers are likely to view it as

interchangeable with Eylea. Sheridan Decl. ¶ 32-33

("[B]iosimilars are known as interchangeable products.").

Thus, while other anti-VEGF medications such as Lucentis and

Avastin have not been viewed by clinicians as comparable to Eylea,

CT-P42 ███████████████████████████████████████████████

███████████████████████████████████    ███████████████

███████████████████████████████████████████████     The

Court finds that providers are likely to treat it as such and could

choose to use CT-P42 instead of Eylea.

The Court also finds that if CT-P42 is permitted to launch,

it will compete with both of Regeneron's Eylea products (of the

non-HD variety) — Eylea sold in a vial and Eylea PFS.  Because a

patient only needs to take one anti-VEGF drug at any given time,

a sale for Celltrion is likely a lost sale of one of these products

for Regeneron.  Sheridan Decl. ¶ 62; Clark Decl. ¶ 8.  Thus, if

CT-P42 launches, Regeneron will likely lose sales and market share

for all its Eylea products.  CT-P42 and the vial and PFS Eylea

products are "competing for the same customers in the same

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

markets," Presidio Components, 702 F.3d at 1363, because they "meet the same needs," Broadcom Corp., 2012 WL 13036855, at *3, namely treating the same angiogenic eye conditions.  Whether all of the affected products practice the asserted claims of the Product Patent — although the 2 mg Eylea in a vial formulation does — is irrelevant.  See, e.g., Broadcom, 543 F.3d at 703 (a patentee can establish irreparable harm even if "it does not currently practice the claimed inventions" at all).  The salient issue is that the products are competing for the same customers to treat the same conditions.  Presidio Components, 702 F.3d at 1363.  The Court finds that CT-P42 and Eylea (in vial and PFS formulations) compete in this way.  Indeed, neither party disputes that they all target the same patients and treat the same angiogenic eye disorders. The Court further concludes that payors' role in purchasing decisions contributes to CT-P42's likely ability to compete with Eylea in 2 mg in both vial and PFS presentation.  The evidence shows that payers can require patients to try a biosimilar medication before paying for any of the more expensive Eylea products.  And payors do not consider the presentation of the medication to be important compared to the price.  Id.  Harm to Regeneron's sales of all its Eylea products is thus relevant to this Court's irreparable harm analysis.

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

Starting with Regeneron's original product, the parties agree that CT-P42 will take market share from Eylea 2 mg sold in a vial and PFS.[15] ██████████ ███ ██████ █████ ████████ ██ ██

██████████████████ ██████ █████ █████ ██ █ ████ ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

Celltrion argues that Regeneron will not suffer irreparable harm in the form of lost sales because Regeneron's expert failed to address how lost sales are not compensable through damages; and because biosimilars cause only "little decline in sales" in their first year on the market. Opp. 22, 24. Neither of these arguments is compelling.

First, the launch of a biosimilar is likely to alter the

---

[15] Regeneron urges the Court to consider CT-P42's impact on, among other products, Eylea HD. As it has in related cases, the Court declines to do so for the reasons set forth in <u>Mylan</u> which the Court incorporates here. <u>In re: Aflibercept Patent Litigation</u>, 1:24-MD-3103, ECF No. 162 at 16-24. As discussed herein, however, the Court does consider the Eylea PFS product in its analysis given the infringement claims Regeneron asserts in this particular case.

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

dynamics of the anti-VEGF landscape.  As discussed above, Regeneron's Eylea 2 mg products compete with a few different anti-VEGF medicines, but the treatment landscape is still relatively small.  And competition from these other products is less relevant because none of these products use aflibercept or Regeneron's patented technology.  In contrast, if CT-P42 launches, Regeneron would be forced to compete with a product that likely incorporates its own patented technology.

The Court further concludes that the harm from competition with an infringing product is all the more acute here because the infringing product will be marketed as a biosimilar.  By its nature, a biosimilar is a near-exact clinical substitute for its reference product.  If CT-P42 enters the market it will appear, not merely as a direct competitor, but as a purported replacement for Eylea.  And, as discussed above, physicians are likely to directly substitute it for Eylea.  ████████████████████

████████████████████████████████████████

████████████████████████████████

"Given the size and nature of the [anti-VEGF patient population] . . . a sale of [CT-P42] would quite likely be a lost sale for [Regeneron]."  Lonza Walkersville, 581 F. Supp. 3d at 750.  "Loss of market share constitutes irreparable injury because

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

market share is so difficult to recover. . . . Moreover, [t]he right to exclude direct competition in a limited sphere, a right inherent in the grant of a patent, is irreparably harmed by the loss of sales and the competitive foothold that the infringer will gain." Indivior Inc., 2018 WL 3496643, at *12 (internal quotation marks omitted). In light of the foregoing, the Court concludes that Regeneron has demonstrated irreparable harm from CT-P42's competition with the Eylea 2 mg products.

Celltrion next argues (Opp. 24) that Regeneron's lost market share is quantifiable and that legal remedies are adequate to compensate Regeneron. This Court disagrees. Courts regularly recognize that being forced to "compete against products that incorporate and infringe [one's] own patented inventions" creates irreparable harm. Douglas Dynamics, 717 F.3d at 1345. The same is true here.

Competition with an infringer may cause irreparable harm, even if there are a dozen other infringers in the marketplace. Metalcraft of Mayville, Inc. v. The Toro Company, 848 F.3d 1358, 1368 (Fed. Cir. 2017). In Metalcraft, the court upheld the trial court's finding of irreparable harm where "loss[es] . . . of customers may have far-reaching, long-term impact on [the patentee's] revenues, and the sales lost . . . are difficult to

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

quantify due to 'ecosystem effects, where one company's customers will continue to buy that company's products.'" Id. (quoting Apple Inc. v. Samsung Elecs. Co., 809 F.3d 633, 641, 645 (Fed. Cir. 2015)).  So too here.  As discussed above, there is no way to know how many patients Regeneron will lose because of payor policies, and those losses are likely to be permanent.  Sheridan Decl. ¶¶ 75-76.

Thus, this Court concludes that Regeneron has shown its likely harm due to lost market share and sales is not addressable through legal remedies.

### 2. Price Erosion

When a competing product launches, the patented product often has to drop its price to remain competitive.  This drop in price is consistently recognized as a source of irreparable harm.  See, e.g., Celsis In Vitro, 664 F.3d at 930 (affirming price erosion as source of irreparable harm); Sanofi-Synthelabo, 470 F.3d at 1383 n.9 (same); Abbott Lab'ys, 544 F.3d at 1362 (same).

"The phenomenon of price erosion in the pharmaceutical industry is well known."  Hoffmann-La Roche Inc. v. Cobalt Pharm. Inc., 2010 WL 4687839, at *12 (D.N.J. Nov. 10, 2010), modified, 2012 WL 458435 (D.N.J. Feb. 9, 2012).  And "[p]rice erosion is most likely to occur in cases . . . in which no generic competitors

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

have yet entered the marketplace, placing the patentee in an exclusive position." Id.

Price erosion is typically irreversible even if the infringing product exits the market because returning prices to pre-infringement levels risks loss of goodwill and reputation with payors and customers. Sanofi-Synthelabo v. Apotex Inc., 488 F. Supp. 2d 317, 343 (S.D.N.Y. 2006) (patentee would be "harmed by loss of consumer good will by customers who will have grown accustomed to lower prices" if it restored pre-infringement pricing), aff'd, 470 F.3d 1368 (Fed. Cir. 2006); Celsis In Vitro, 664 F.3d at 930 (same).

Regeneron has shown that CT-P42's launch will force Regeneron to reduce the prices of its Eylea products. Clark Decl. ¶¶ 8-10; Sheridan Decl. ¶ 62.



** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

████████████████████████████████████████████████████████████

████████████████████████████████████████████    ████████████

███████

### a. The launch of a biosimilar typically causes price erosion

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████    ████████    ████████  ██  ████    The WAC is the price a drug manufacturer lists, not including any discounts, rebates, or negotiated price reductions. Id. ¶ 35. And biosimilars launch at an average ASP — the average price that manufacturers charge purchasers after discounts and rebates — that is half that of the branded drug. Id. ¶¶ 35, 38. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████    ████████████████████

████████████████████████

Samsung Bioepis's Biosimilar Market Report for Q1 2024 states that "[b]iosimilar launches have led to significant price decreases over time," and "[o]n average, ASP declined by 41% three years . . . post first biosimilar launch with more mature markets

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

demonstrating increasing price concessions." Sheridan Ex. 33 at 12 (ECF No. 108-25).

Amgen has observed the same trend, stating in its 2022 Biosimilars Trend Report that the ASP "for both reference products and biosimilars" "is declining, due to competition." Sheridan Ex. 52 at 6 (ECF No. 108-27); Sheridan Decl. ¶ 39. This same report shows that biosimilar prices "have decreased at a negative compound annual growth rate . . . of -9% to -24%," and "[t]he prices of most reference products have decreased at a negative [compound annual growth rate] of -4% to -21%." Sheridan Ex. 52 at 6. Amgen's 2022 Report contains a graph illustrating the trend in reference products' declining ASP following the launch of biosimilars:



Id. at 13 (Fig. 5); Sheridan Decl. ¶ 39.

Ophthalmic drugs are not immune from this trend, as the launch of ranibizumab biosimilars has shown. Sheridan Decl. ¶ 41;

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

_____

Sheridan Ex. 33 at 9 ("Recent ranibizumab biosimilar launches have already led to lower reference product ASP costs.").  When these biosimilars entered the market, Genentech, the maker of the branded biologic Lucentis, was forced to reduce its ASP to or below the ASPs of the competing biosimilars.  Sheridan Decl. ¶ 41.  As of Q1 2024, the ASP of all ranibizumab products has declined 23% since the biosimilars' launch.  Sheridan Ex. 33 at 22.  Despite these price reductions, Lucentis continued to lose significant market share to ranibizumab biosimilars; as of Q3 2023, the two ranibizumab biosimilars hold a combined market share of 34%.  Id.

The figures below, featured in Samsung Bioepis's 2024 Market Report, illustrate the decline in Lucentis's ASP and market share that ranibizumab biosimilars caused:



Id. (Figs. 27 and 28).

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

**b. Regeneron will likely experience price erosion if CT-P42 launches**

The downward pricing pressure Eylea will face after CT-P42's launch is different in kind from ordinary, non-biosimilar competition with other anti-VEGF medications.  Almost across the board, biosimilars lead to permanent price erosion of the reference drug.  That is because their launch causes the reference drug to compete for the first time with <u>its own formulation</u>.  The same will happen with Eylea if CT-P42 is allowed to launch.



** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION



** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---



Indeed,

Mr. Malackowski suggests in his report that Regeneron could later reverse rebates and discounts. See Malackowski Decl. ¶ 92 (noting that drug companies "routinely" adjust their prices). That is unrealistic. If Regeneron is forced to lower prices on Eylea because of biosimilar entry, such price erosion will likely be permanent.

** SEALED **

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---



Given this ample evidence in the record showing declines in

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

reference product pricing following a biosimilar's launch, and the evidence of Celltrion's plans in particular, the Court finds that Regeneron is likely to suffer price erosion if CT-P42 is allowed to launch. And based on this same body of evidence, the Court finds that the price of Regeneron's Eylea is unlikely to return to pre-launch levels even if CT-P42 is later taken off the market following trial.

Celltrion does not contest that Regeneron is likely to suffer price erosion upon CT-P42's launch, and instead only argues that such harm would be minimal in the short-term, quantifiable, and would not extend post-trial, should CT-P42 be removed from the market at that time. Opp. 22-24.

████████████████████████████████████████████

███████████████████████████████████ "[p]rice erosion is most likely to occur in cases . . . in which no generic competitors have yet entered the marketplace, placing the patentee in an exclusive position." Hoffmann-La Roche, 2010 WL 4687839, at *12. Currently, Regeneron is the only company with an aflibercept product on the market, and, ███ ███ █████████ ███ █████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION 6762                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

████████████████    ██████████████████████

████████████████████████

    The Federal Circuit often has upheld findings of irreparable harm based on evidence that the infringer offered "significantly discounted prices" forcing the patentee to have to lower its prices to compete.  <u>Celsis In Vitro</u>, 664 F.3d at 930.  ████████████ ██████████████████████ Thus, based on the consistent recognition that such a price drop is a source of irreparable harm, this Court holds that allowing Celltrion to launch CT-P42 would irreparably harm Regeneron.

    Moreover, Regeneron's harm from price erosion is likely to be irreversible, even if Celltrion eventually loses at trial and CT-P42 exits the market.  For one, contractual price concessions would be locked in for at least the terms of the contracts.  And, because Medicare reimbursement rates lag market pricing, future price increases would leave physicians paying a higher rate to purchase Eylea than they were being reimbursed.  In short, Regeneron could only raise its prices by risking the "loss of consumer good will by customers who will have grown accustomed to lower prices." <u>Sanofi-Synthelabo</u>, 488 F. Supp. 2d at 343.

    The harms to Regeneron from price erosion are also unlikely to be fully calculable or compensable.  The evidence shows that it

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

will be nearly impossible to calculate and fully compensate for price erosion, in part because price erosion will extend beyond any damages period and may impact future price negotiations in unquantifiable ways.  Id.

### 3. Disruption of Patentee-Payor Relationships

When "third-party payors control a substantial portion of . . . sales," the entry of a competing drug product has the "potential to irreversibly alter the reimbursement relationship" and create irreparable harm to patentees. Hoffmann-La Roche, 2010 WL 4687839, at *12.  These harms are distinct from price erosion and arise from irreversible formulary position losses.  And courts have recognized this economic reality in the pharmaceutical market when an infringing drug launches.  See King Pharm. Inc. v. Corepharma, LLC, 2010 WL 1850200, at *3 (D.N.J. May 7, 2010) (crediting economist's testimony that "payors . . . will move [the patentee]'s patented product off of their formularies in the presence of generic competitors").

Harm to payor relationships and status are well-recognized as irreparable.  See Indivior Inc., 2018 WL 3496643, at *12 ("Courts have found that a reduction of market share due to the loss of formulary status and a change in tier pricing, constitutes irreparable harm."); Abbott Lab'ys, 544 F.3d at 1361-62 (similar).

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

The Court finds that the entry of CT-P42 will "irreversibly alter the reimbursement relationship" and impose long term damage to Regeneron.  Hoffmann-La Roche, 2010 WL 4687839, at *12.

The Court finds that CT-P42's launch is also likely to disrupt Regeneron's relationships with payors permanently.  Sheridan Decl. ¶¶ 85-87.  When a lower-cost treatment (e.g., a biosimilar) comes on the market, ███████████████████████████████████████

███████████████████████████████   ████████████████████

███████████████████████████  This requirement is known as a "step edit," referring to patients having to "step through" the cheaper alternative before trying the more expensive drug.  Clark Decl. ¶ 14.  Once insurers and other payors implement a step edit, the more expensive medication becomes a second-line treatment, █

███████████████████████████████████  Sheridan Decl. ¶¶ 64, 76, 84; Clark Decl. ¶ 11.  Harms from step edits are incalculable because there "is no effective way to . . . ascertain the people who do not knock on the door . . . because of the existence of the infringer."  Celsis In Vitro, 664 F.3d at 930 (citation omitted).

Regeneron's evidence showed that Eylea is now a first-line treatment for ███████████████████████ patients with angiogenic eye disorders.  Clark Decl. ¶ 14; Sheridan Decl. ¶ 64.  In other

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

words, the large majority of patients receive insurance coverage for Eylea without first trying another treatment option or experiencing a "single step edit." And only ██  ████ ████████████████████████████████████ are currently subject to a "double step edit" under which they must try two other medications before receiving coverage for Eylea. Sheridan Decl. ¶ 64; Clark Decl. ¶ 14.



It is thus reasonable to expect that an aflibercept biosimilar launching likely will encourage more payers to implement an Eylea step edit. This effect will be more pronounced if the biosimilar launches at a substantial discount relative to Eylea. ██ ██ ████████

** SEALED **

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

████████████████   ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████   Celltrion's intent to

offer CT-P42 at a "low cost" relative to Eylea suggests that such

step edits are likely in this case.  Sheridan Ex. C-8 at -701.

Harm to Regeneron from step edits is likely irreversible.  ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████   ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████   ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████   ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████   Nor are such step edits

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

likely to be reversible. The Court concludes that such a "loss of
formulary status and a change in tier pricing, constitutes
irreparable harm." Indivior Inc., 2018 WL 3496643, at *12.

### 4. Reputational Harm

Reputational injury is a well-recognized form of irreparable
harm. Douglas Dynamics, 717 F.3d at 1344-45. This can occur when
a doctors or patients know that a patentee is responsible for
removing an available drug. See AstraZeneca LP v. Apotex, Inc.,
623 F. Supp. 2d 579, 613 (D.N.J. 2009) ("AstraZeneca claims that
an unauthorized launch by Apotex (followed by a subsequent exit)
would result in intangible and unquantifiable damage to
AstraZeneca's reputation and goodwill. For example, they assert
that doctors who would have prescribed Apotex's BIS may blame
AstraZeneca for the sudden unavailability of Apotex's generic BIS
once Apotex is forced to leave the market. . . . The Court agrees
that an unauthorized launch by Apotex would have some intangible
effects on AstraZeneca's goodwill."), supplemented, 623 F. Supp.
2d 615 (D.N.J. 2009), aff'd, 633 F.3d 1042 (Fed. Cir. 2010);
Baxalta Inc. v. Genentech, Inc., 2018 WL 3742610, at *11 (D. Del.
Aug. 7, 2018) (where defendant already launched its product prior
to the preliminary injunction hearing, patentee would suffer
reputational harm when doctors would know that patentee was

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

responsible for removing an available drug).

Regeneron has established that it will suffer reputational harms if CT-P42 is permitted to launch but later is removed from the market. If CT-P42 launches and then is taken off the market as a result of litigation, providers and, most importantly, patients will blame Regeneron for the loss of their chosen treatment. Sheridan Decl. ¶¶ 85-87. Unlike a course of antibiotics or a temporary pain-relief medication, patients must take aflibercept regularly for a long time. See Mylan Trial Tr. 137:3-14 (Yancopoulos). CT-P42's removal from the market after a trial, once it has been administered to perhaps thousands of patients, will disrupt these patients' course of treatment. Not only may patients feel uncomfortable switching medication mid-course; they will also have to seek approval from private insurers and Medicare and Medicaid for a different product, a process likely to interrupt their treatment. Sheridan Decl. ¶ 87. Finally, due to the anticipated lower cost of CT-P42 relative to Eylea, it is likely that the physicians who adopt CT-P42 early will feel a financial impact were CT-P42 removed from the market, and that they would attribute that financial impact to Regeneron. The Court finds that this harm to Regeneron's relationships with its customers and their treatment regimen would be a likely result

** SEALED **

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

were CT-P42 permitted to launch.

Celltrion argues that this form of harm is "pure speculation and is unsupported." Opp. 23. The Court finds this argument unpersuasive. Courts regularly recognize the likelihood of reputational harm where a patentee is forced to compete with its own innovations, see Douglas Dynamics, 717 F.3d at 1344, or where a patentee is viewed as responsible for removing an infringing drug from the market post-launch, see Baxalta, 2018 WL 3742610, at *11. Celltrion offers no explanation as to why this authority is distinguishable from the instant matter. Because Regeneron has established that it likely would be blamed for the removal of CT-P42 should CT-P42 launch and then be removed from the market post-judgment for Regeneron, Regeneron has demonstrated irreparable reputational harm.

### 5. Marketing and Training Costs

Courts often consider the effect of infringing activity on the patented product's salesforce and marketing activity. See Sanofi-Synthelabo, 488 F. Supp. 2d at 342 ("Sanofi has shown for the purposes of this motion that it will be irreparably harmed . . . by layoffs of employees involved in marketing Plavix," a patented product, upon the launch of a lower cost generic); Bio-Rad Lab'ys, Inc v. 10X Genomics, Inc., 967 F.3d 1353,

IN RE: AFLIBERCEPT PATENT LITIGATION770                        1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

1378 (Fed. Cir. 2020) (crediting the trial court's finding that the patentee would have to "increase its marketing costs" in considering irreparable harm).

Regeneron presented evidence that it would have to invest in new marketing and training efforts upon the launch of one or more infringing biosimilars, ███████████████████████████████

███████████████████████████████████████████████████████████

██ ██████ ███████ ██████ ███████ ██ ██ ████ ██████████

██████████ Clark Decl. ¶ 18.

Celltrion's economic expert, Mr. Malackowski, suggests that the prospect of additional marketing and training is speculative. Malackowski Decl. ¶ 117. However, Mr. Malackowski lacks expertise in the ophthalmologic pharmaceutical industry, see Malackowski Tr. 48:1-52:4, while Mr. Clark is responsible for actually implementing these marketing and training programs for Regeneron and is aware of their costs. As such, the Court credits Mr. Clark's testimony that ████████████████████████████████

████████████████████████████████████ Forcing a patentee to "increase its marketing costs" can contribute to the irreparable harm analysis. See Bio-Rad, 967 F.3d 1353 at 1378. The likely increased marketing costs would irreversibly divert resources from other projects that Regeneron might undertake in the absence of

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

infringement, and contribute to the irreparable harm suffered by Regeneron.

### 6. Research and Development

Regeneron also suggests, as a separate form of irreparable harm, that its research and development (R&D) funding and spending will be negatively affected if FYB203 launches. The Court rejects this as a basis of irreparable harm here.

As it did in <u>Mylan</u>, <u>Formycon</u> and the <u>Samsung</u> cases, the Court again finds Regeneron did not meet its burden with this element of claimed irreparable harm. <u>See</u> <u>In re: Aflibercept Patent Litigation</u>, ECF No. 162, at 42-46; ECF No. 171, at 150-152; ECF No. 193 at 171-173. The Federal Circuit cautioned against allowing generalized assertions that loss of revenue would lead to a loss of research and development opportunities because

> that claim of injury is not materially different from any claim of injury by a business that is deprived of funds that it could usefully reinvest. If a claim of lost opportunity to conduct research were sufficient to compel a finding of irreparable harm, it is hard to imagine any manufacturer with a research and development program that could not make the same claim and thus be equally entitled to preliminary injunctive relief. Such a rule would convert the "extraordinary" relief of a preliminary injunction into a standard remedy, available whenever the plaintiff has shown a likelihood of success on the merits.

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Eli Lilly & Co. v. Am. Cyanamid Co., 82 F.3d 1568, 1578 (Fed. Cir. 1996) (affirming denial of injunction against generic drug competitor). This principle also differentiates a case upon which Regeneron relies, Amgen v. F. Hoffman-LaRoche, 581 F. Supp. 2d 160, 212 (D. Mass. 2008). In Amgen, the district court noted that Amgen's infringed patents were directed to "the source" of "what enables mass production and commercial viability" of the drug at issue. 581 F. Supp.2d at 195. The patents also were "admittedly 'the foundation of Amgen's business,'" and any question into their value or ability to keep other competitors off the market would cause Amgen to lose access to research and development funds. Id. at 212. Regeneron's cited cases also do not support a finding of irreparable harm. In Mylan Institutional, for example, there was evidence of record that the harm to R&D would result from the loss of "half or more of [patentee's] revenue," ███ ██ ██ ████

████████████████████████████████████████████████████

██████  See Mylan Institutional LLC v. Aurobindo Pharma Ltd, 2016 WL 7587325, at *23 (E.D. Tex. Nov. 21, 2016). The same is true of Regeneron's Janssen case. See Janssen Prods., L.P. v. Lupin Ltd., 109 F. Supp. 3d 650, 697 (D.N.J. 2014) (irreparable harm where evidence indicates "Janssen would lose 70 to 80 percent of its sales upon a generic launch"). Therefore, consistent with

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

this Court's findings in <u>Mylan</u>, <u>Formycon</u> and the <u>Samsung</u> cases,
Regeneron's claimed impact on R&D prospects finds no basis in
either fact or law, and the Court does not rely upon it in issuing
the permanent injunction.

### 7. Near-Term Harms to Regeneron

The evidence indicates that CT-P42's launch will harm
Regeneron's Eylea products on a timeline that requires injunctive
relief. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████  ████████

███████  ████████  ████  █  ██████  █████  ████  ████  ████████

Celltrion argues that because the uptake of biosimilars in
ophthalmology will be slow, any possible irreparable harm is
unlikely to materialize on a timeline sufficient to warrant
injunctive relief. Opp. 22; Malackowski Decl. ¶¶ 68-80. The
record does not support that argument.

### a. Regeneron is likely to experience immediate share loss

As an initial matter, Anti-VEGF drugs with biosimilars have
seen significant market share erosion over a short time period.
For example, despite launching in mid-2019, as of 2020, bevacizumab
biosimilars achieved a higher share of the market than branded

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Avastin.  Sheridan Ex. 33 at 14.  By Q3 2023, biosimilars made up 87% of all bevacizumab sales.  Id.

This experience is consistent with industry expectations for biosimilars generally.  The Samsung Bioepis Biosimilar Market Report for Q1 2024 states:  "On average biosimilars gain 53% market share within three years (12 quarters) post initial launch." Sheridan Ex. 33 at 11.  Those averages, however, reflect data for biosimilars with variable uptake speeds, which can be categorized as fast or slow.  Id.  Ophthalmology biosimilars are classified as exhibiting a "fast uptake speed."  Id.

Celltrion's argument that ophthalmologists will be slow to adopt an aflibercept biosimilar (Opp. 22), is thus outdated. Celltrion's expert relies heavily on a 2022 "Biosimilars Trend Report," which showed, by way of example, that "there was a 'slow start in capturing share for infliximab biosimilars' due to certain factors, including 'physician caution around changing medicines for chronic conditions.'"  Malackowski Decl. ¶¶ 68-71 (quoting Sheridan Ex. 52).  However, more recent information regarding ophthalmology in particular shows increased uptake of ophthalmology biosimilars since 2022, and ophthalmologists are likely aware that others are in the pipeline.  See, e.g., Sheridan Ex. 33 at 11 (Samsung Bioepis Biosimilar Market Report showing

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

rapid uptake of Ranibizumab (Lucentis) biosimilars in the first four quarters post-launch). While ophthalmologists may have hesitated to embrace an ophthalmology biosimilar before any were available, these attitudes have likely changed now that doctors have been using such products some time. █████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████     ██████████████

████

In fact, recent survey data shows that ophthalmologists are more comfortable prescribing biosimilars today. See Sheridan Ex. 33 at 11 (noting, in a 2024 market report, "Fast Uptake Speed" as a feature of "[o]ncology[], pegfilgrastim, and ophthalmology biosimilars"). There is no reason to credit the suggestion that physicians will be hesitant to prescribe biosimilars when the more recent and more reliable data shows the opposite and continues to trend in that direction.

### b. Regeneron is likely to experience immediate price erosion

Regeneron is also likely to experience immediate price erosion, as demonstrated by the example of ranibizumab biosimilars. ███  ██████████  ████████  █████  ████  ████████

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Lucentis's experience thus presents applicable evidence that ophthalmology biosimilar entry will cause price erosion of the reference product, and it also suggests that Eylea's price erosion may be particularly steep.

Celltrion's documents also support the notion that Eylea will suffer price erosion immediately after CT-P42 launches. <u>See</u> Sheridan Ex. C-4.

The Court finds that price erosion is likely to occur as soon as aflibercept biosimilars launch,

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

### c. Regeneron will Likely Experience Immediate Harm to Payor Relationships

Regeneron also faces substantial risk that its Eylea 2 mg products will become subject to step edits shortly after a biosimilar's launch. ██████ ████████████ ████████ ██████ ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████  ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████  ██████████████

██████████████████

### d. CT-P42's launch will immediately cause Regeneron's other harms

The harm to Regeneron's marketing and training efforts would occur immediately following any CT-P42 launch, and its most significant reputational harms would likely be incurred whenever CT-P42 is removed from the market, such as after a final judgment of infringement is issued.

Accordingly, the Court finds it likely that Regeneron would suffer immediate harm from CT-P42 launching.

### 8. Complexities in the Competitive Landscape

Accepted methods of calculating lost profits would likely not account for the harm to Regeneron from CT-P42's launch.

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

First, a damages expert quantifies lost profits in a patent infringement matter based on the but-for competitive landscape; that is, an analysis of what the competitive market would have been at a particular moment in time absent an infringing product's entry.  Sheridan Decl. ¶ 88.  Where the marketplace at issue is dynamic or in flux, limiting the analysis to a particular moment in time requires simplifying assumptions and tends to understate damages.  Id.

The market for anti-VEGF ophthalmic treatments is in flux, given the entry and exit of several competing products, approvals of new indications for existing products, and changing patient populations.  Id. ¶¶ 89, 99-100.  Eylea currently faces competition from non-infringing products — other anti-VEGF biologics like Avastin and Lucentis — which in turn have their own biosimilars and may generate yet more biosimilar entrants.  Id. ¶ 90.  In addition, up to ███ other aflibercept biosimilars could seek to launch in 2024 unless enjoined, with more to follow.  Id.  Isolating and fully capturing the impact of one biosimilar would be difficult, if not impossible.  Id. ¶ 93.  Regeneron will have to adjust its marketing strategies in response to each entry and exit, which will affect the market in turn.  Id. ¶¶ 91, 95.

IN RE: AFLIBERCEPT PATENT LITIGATION779                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

_____

Second, the impact of payor policies will be difficult to calculate over the life of the product and is likely to be undervalued in any such calculation. If payors implement step edits, moving patients away from Eylea, many of these customers will never purchase Eylea. There is no way to know how many patients Regeneron will lose because of these step edits, and those losses are likely to be permanent. Sheridan Decl. ¶¶ 75-76. The parties thus could not quantify adequately the patients who would have been treated with an Eylea product had they not first been forced to step through an infringing biosimilar.

Third, Regeneron has shown that it would be difficult to account for the harm it will suffer to its reputation and the efforts it will undertake to develop new training programs in response to CT-P42's launch. Although it is likely that CT-P42's entrance would inflict these harms, the scope of such harm is yet unknown and would be difficult to address in a damages model.

These factors pile uncertainty upon uncertainty in any damages model. Thus, the market positions of the Eylea 2mg products but-for one specific infringing biosimilar's launch would be particularly difficult to estimate. And were a damages expert to attempt estimating Regeneron's damages due to CT-P42's launch, he or she would have to employ a slew of simplifying assumptions,

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

resulting in a lower damages amount that would not fully reflect the harm Regeneron would have suffered.

### 9. Causal Nexus

To obtain injunctive relief, a patentee must show "some causal nexus between [a defendant's infringement] and [the] alleged harm" — i.e., "show that the patentee is irreparably harmed by the infringement." Apple Inc. v. Samsung Elecs. Co., 735 F.3d 1352, 1363-64 (Fed. Cir. 2013) ("Apple III").

In cases involving "complex, multi-featured" products, such as "smartphones and tablets," where consumer demand is driven by some features of the finished good and not others, this nexus analysis can be complicated. Id. at 1362; see also Genband US LLC v. Metaswitch Networks, Corp., 861 F.3d 1378, 1384 (Fed. Cir. 2017) (discussing "the causation approach suitable for a multi-feature, multi-purchaser context"). In such cases, a patentee must show "some connection between the patented feature and demand" for the accused product, though it need not "show that a patented feature is the exclusive reason for consumer demand." Apple III, 735 F.3d at 1364.

The nexus inquiry can be much simpler for products that "ha[ve] a small number of features," like medications. Id. at 1361-62. That is because the nexus inquiry has "little work to

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

do . . . when the infringing product contains no feature relevant to consumers' purchasing decisions other than what the patent claims." Genband, 861 F.3d at 1384 n.2.  Accordingly, the multi-feature nexus analysis is straightforward for patents that cover the product itself instead of a "feature" or "attribute[] of the finished consumer good" because "it is not possible to separate" the patent "from the product itself in evaluating consumer demand and nexus." Janssen Prods., 109 F. Supp. 3d at 700.  In such cases, nexus is "apparent." Genband, 861 F.3d at 1384 n.2.  If the "Patent encompasses nearly the entire Device[, then] . . . Demand for the Device can fairly be described as demand for the Patent." Apnea Scis. Corp. v. Koncept Innovators, Inc., 2016 WL 9086937, at *6 (C.D. Cal. Nov. 7, 2016); see also Power Probe Grp., Inc. v. Innova Elecs., Corp., 2023 WL 7043388, at *13 (D. Nev. Oct. 25, 2023) (distinguishing multi-featured nexus inquiry because "Plaintiff's patent encompasses the entire product at issue, not merely a feature, and Plaintiff's evidence that it will likely suffer irreparable harm absent an injunction demonstrates the requisite causal nexus").

Applying the above principles to the pharmaceutical context, the nexus requirement is satisfied if a manufacturer "would not be able to make the products proposed in its" regulatory filing

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

without infringing the asserted patents. Janssen Prods., 109 F. Supp. 3d at 699; see also Mylan Institutional LLC v. Aurobindo Pharma Ltd., 857 F.3d 858, 873 (Fed. Cir. 2017) (upholding nexus finding because "[w]ithout infringing the . . . patents" defendants "would not be able to make the . . . product described in its ANDA" (internal quotation marks omitted)).

If the connection between the infringed patent and the harm is undeniable, courts often find irreparable harm without discussing the nexus factor. See Metalcraft of Mayville, 848 F.3d at 1368-69(affirming the grant of a preliminary injunction after reciting, but not discussing, the nexus requirement of the irreparable harm factor); see also In re Depomed Patent Litig., 2016 WL 7163647, at *78 (D.N.J. Sept. 30, 2016), aff'd sub nom. Grunenthal GMBH v. Alkem Lab'ys Ltd., 919 F.3d 1333 (Fed. Cir. 2019) (finding irreparable harm after reciting, but not discussing, the nexus requirement).

The Court finds that Regeneron has shown "some causal nexus between [Celltrion's infringement] and the alleged harm," which is sufficient to demonstrate that Regeneron "is irreparably harmed by the infringement." Apple III, 735 F.3d at 1363-64.

Celltrion's CT-P42 product is not a "complex, multi-featured" product, where consumer demand is driven by some features of the

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

finished product and not others.  Id. at 1362.  In Apple III, for example, the patentee sought to enjoin the sale of various smartphones and tablets, and the patents at issue were directed to specific features of those devices, like pinch-to-zoom and double-tap-to-zoom functionalities that allow users to navigate the display screens.  Id. at 1358.  CT-P42 does not have analogous segregable features that one can mentally divide and then ask: "Is this a feature that drives demand?"  There is no "feature" that parallels, for example, a double-tap to zoom gesture on a smart phone.  Thus, Regeneron need not show the specific "connection between the patented feature and demand" that is required in cases involving multi-featured products.  Id. at 1364.

In other words, the nexus inquiry has "little work to do" because CT-P42 "contains no feature relevant to consumers' purchasing decisions other than what the patent claims," which is the drug product.  Genband, 861 F.3d at 1384 n.2.  The multi-feature nexus analysis does not apply to the Product Patent because its claims cover CT-P42 itself, in both its vial and PFS formulations—not a "feature" or "attribute[] of the finished consumer good."  Janssen Prods, 109 F. Supp. 3d at 700.  Indeed, in assessing nexus in another context, the Court previously noted that there was a connection between the Product Patent's claims

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

and certain unexpected properties because Eylea exhibited those properties and Eylea "is the invention disclosed and claimed in the [Product] patent." Mylan, 2024 WL 382495, at *60. So too here. The claims require a vial or PFS comprising aflibercept, an organic co-solvent, a buffer, and a stabilizing agent and 98% native conformation as measured by SEC. Celltrion's CT-P42 product — not a component or feature thereof — is the subject of the allegedly infringed claims. As a result, "it is not possible to separate" the Product Patent "from the product itself in evaluating consumer demand and nexus." Janssen Prods, 109 F. Supp. 3d at 700. Thus, nexus is "apparent." Genband, 861 F.3d at 1384 n.2.

In yet another framing of this concept as it applies in the pharmaceutical context, the nexus requirement is satisfied here because Celltrion likely "would not be able to make the products proposed in its" BLA without infringing the Product Patent. Janssen Prods., 109 F. Supp. 3d at 700. Celltrion has not offered any evidence that it has sought FDA approval to manufacture any alternative biosimilar aflibercept products that do not infringe. Because "without infringing the . . . patent[]" Celltrion likely "would not be able to make the . . . product described in its" BLA, Celltrion's infringement is a prerequisite to CT-P42's sales

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

and thus causes Regeneron's harm.  <u>Mylan</u>, 857 F.3d at 873 (internal quotation marks omitted).

Even were the Court to ignore that Celltrion has sought FDA approval only for CT-P42 and ask instead whether Celltrion <u>could</u> make and obtain approval for some non-infringing alternative biosimilar product, the result of the Court's analysis would be the same.  Dr. Trout explained that Celltrion could not "simply alter the CT-P42 vial or CT-P42 PFS formulation to attempt to avoid infringement" and that "any necessary changes would require additional testing and other product changes, with no guarantee that a non-infringing product would work as intended."  Trout Decl. App'x A ¶ 5.

The Court also holds that Regeneron has demonstrated nexus even under the multi-feature standard.  The Court previously found that "Eylea demonstrated three critical and unexpected properties: comparable (1) safety and (2) efficacy to ranibizumab, along with (3) the durability to be dosed half as frequently as ranibizumab (after three loading doses for wet AMD)" and that Regeneron had "established a sufficient nexus between the claims [of the Product Patent] and the unexpected properties."  <u>Mylan</u>, 2024 WL 382495, at *59-60.  With respect to efficacy and extended dosing intervals, the Court found:  "The record at trial demonstrated that the

IN RE: AFLIBERCEPT PATENT LITIGATION786                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

unexpected properties stemmed from the claimed compositions as a whole, including the 40 mg/ml aflibercept concentration. . . . [T]he aflibercept protein does contribute to the longer half-life of Eylea, . . . but aflibercept's concentration is also critical to its half-life." Id. at *60. With respect to safety, the Court found: "[T]he stability of the claimed compositions, including the required 98% native conformation, indicated to the POSA that there's a relatively lower risk of inflammation." Id. (quotation marks omitted). These features help drive Eylea's success; Celltrion's infringement of the Product Patent will thus likewise drive the success of its product, and cause Regeneron's harms.

The nexus requirement is thus satisfied.

## E. The Balance of Equities Favors an Injunction.

This third injunctive relief factor requires the court to balance the harm an injunction would cause to the party opposing an injunction with the harm the movant would suffer should the requested injunction be denied. Robert Bosch, 659 F.3d at 1156. In performing this balancing of hardships, the court considers only the harm to the parties, not to the interests of third parties such as customers or patients. Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1330 (Fed. Cir. 2008).

IN RE: AFLIBERCEPT PATENT LITIGATION787                              1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

Regeneron contends that, absent injunctive relief, Celltrion will launch CT-P42 and compete directly with Regeneron, placing a substantial hardship on Regeneron.  Regeneron PI Br. at 19-24. Regeneron argues that such sales of CT-P42 will cause it to suffer irreparable harms, including market share erosion, price erosion, disruption of payor relationships, harm to the commercial trajectory of Regeneron's Eylea HD product,[16] reputational harm, and loss of research and development funding.[17]  Id.  Regeneron submits testimony from Mr. Clark and Dr. Sheridan to substantiate those harms.  Clark Decl. ¶¶ 6-19; Sheridan Decl. ¶¶ 60-101.

Celltrion argues it too will suffer lost sales of CT-P42 if an injunction is entered.  Opp. 25.  Celltrion contends ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████  While the precise amount of lost sales of CT-P42 is uncertain, Regeneron does not dispute at least some sales will be lost if an injunction is entered.

Regeneron responds that lost sales of CT-P42 are not harms

---

[16] As noted above, the Court does not consider Eylea HD in its irreparable harm analysis.

[17] Likewise, the Court does not consider research and development funding as the basis for an injunction against Celltrion.

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

that should be given weight in the balance of hardships analysis, as they would be sales of a product that likely will be found to infringe Regeneron's patent rights. Reply at 15. Regeneron further contends that any harms to Celltrion from lost sales of CT-P42 will be fully redressed by requiring Regeneron to post a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. Id.

The Court finds the balance of hardships favors the requested injunctive relief here. As described above, the Court finds that the launch and continued sale of CT-P42 in the absence of an injunction will result in direct competition between Celltrion and Regeneron and cause harms to Regeneron that cannot be fully calculated, quantified, or compensated by remedies available at law. Sheridan Decl. ¶¶ 60-101. Forcing a patentee to compete directly with its patented technology results in substantial hardship on the patentee. Robert Bosch, 659 F.3d at 1156 ("requiring [the patentee] to compete against its own patented invention, with the resultant harms described above, places a substantial hardship on [the patentee]."); Hafco Foundry & Mach. Co. v. GMS Mine Repair & Maint., Inc., 2018 WL 1786588, at *4 (S.D.W. Va. Apr. 12, 2018) (patentee "will be forced to compete against its own patent, in itself, a significant hardship").

171

IN RE: AFLIBERCEPT PATENT LITIGATION 3789                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Absent an injunction, Celltrion will launch and sell CT-P42 during the pendency of this litigation, and those sales will cause Regeneron to suffer market share erosion, price erosion and disruption of payor relationships. Supra Section II.E; Clark Decl. ¶¶ 6-19; Sheridan Decl. ¶¶ 60-101. In the event CT-P42 were later removed from the market, Celltrion's at-risk launch also would cause Regeneron to suffer loss of reputation and goodwill should Regeneron attempt to recapture the higher prices eroded by Celltrion. Supra Section II.E; Clark Decl. ¶ 11; Sheridan Decl. ¶¶ 84-87. And, in the event CT-P42 were later removed from the market by a subsequent injunction, Regeneron also would suffer loss of reputation and goodwill associated with being faulted for the removal of a competing product from the market. Regeneron PI Br. at 23 (citing Baxalta, 2018 WL 3742610, at *11).

While Celltrion will lose some prospective revenue from issuance of an injunction, those lost sales of CT-P42 do not tip the balance in Celltrion's favor. Celltrion's lost sales result from its decision to develop and seek to market CT-P42, a drug product the Court has determined likely will be found to infringe at least the Asserted Product Patent Claims. Such lost infringing sales typically are not given meaningful weight in a balance of hardships analysis. See Celsis In Vitro, Inc. v. CellzDirect,

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

Inc., 664 F.3d 922, 931 (Fed. Cir. 2012) ("[T]he preliminary record suggests that LTC's losses were the result of its own calculated risk in selling a product with knowledge of Celsis' patent."); Acumed, 551 F.3d at 1330 (finding no abuse of discretion where a district court did not to consider [the accused infringer's] expenses in designing and marketing the [product], since those expenses related to an infringing product"); Broadcom v. Qualcomm, 543 F.3d 683, 704 (Fed. Cir. 2008) (agreeing that an accused infringer "should not be permitted to prevail on a theory that successful exploitation of infringing technology shields a party from injunctive relief."); Sanofi-Synthelabo, 470 F.3d at 1383 (noting that the accused infringer's harms were "almost entirely preventable" and "the result of its own calculated risk"); Windsurfing Int'l v. AMF, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). Even were Celltrion's lost sales given full weight here, the Court would find they do not outweigh the above-described irreparable harms that Regeneron would incur in the absence of an injunction.

The Court's conclusion on this factor is further supported by the fact that Celltrion has not yet launched CT-P42. An injunction

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

therefore will not force Celltrion to withdraw its product from
the market and face the potential consequences and harms that may
flow from such withdrawal.  Instead, an injunction simply will
maintain the status quo pending trial, imposing only a relatively
minimal hardship on Celltrion.  See Impax Lab'ys, Inc. v. Aventis
Pharms., Inc., 235 F. Supp. 2d 390, 396 (D. Del. 2002) ("[G]ranting
the Motion for Preliminary Injunction will cause Impax only minimal
hardship since doing so will leave Impax in the same position as
it was in before the injunction was granted, i.e., excluded from
the riluzole market.").  The harm from a patentee's loss of the
value of its patent is more substantial than the harm from an
accused infringer's inability to enter the market earlier.  See
Glaxo Grp. Ltd. v. Apotex, Inc., 64 F. App'x 751, 756 (Fed. Cir.
2003) ("[W]ithout the preliminary injunction, Glaxo would lose the
value of its patent while Apotex would only lose the ability to go
on to the market and begin earning profits earlier.").  Thus,
Regeneron's hardship absent an injunction outweighs Celltrion's
hardship if an injunction delays its early entry into the
aflibercept market.

The Court's conclusion is also supported by the bond
requirement of Rule 65(c) of the Federal Rules of Civil Procedure.
Regeneron must "give[] security in an amount that the court

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  Such a bond will ensure Celltrion will be compensated for any lost revenue in the event the Court's injunction is later reversed.  Id.; Glaxo Grp., 64 F. App'x at 756.

### F. The Public Interest Favors an Injunction.

The final factor in the injunctive relief analysis requires the Court to consider the impact of an injunction on the public interest.  Hybritech, 849 F.2d at 1458.  There is a well-recognized "public interest in protecting rights secured by valid patents." Id.; see also, e.g., Sanofi-Synthelabo, 470 F.3d at 1383-84; Patlex Corp. v. Mossinghoff, 758 F.2d 594, 599 (Fed. Cir. 1985).  This factor "nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."  Apple Inc. v. Samsung Elecs. Co., 809 F.3d 633, 647 (Fed. Cir. 2015).

Regeneron contends the public interest factor favors entry of an injunction because the public benefits from innovation in the pharmaceutical industry and that such innovation is fostered by intellectual property rights.  Regeneron PI Br. at 25.  Regeneron points out that it has invested billions to discover and develop

IN RE: AFLIBERCEPT PATENT LITIGATION 1:24-MD-3103
PageID #: 8793

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

its own medicines and argues that this work is made possible by Regeneron's intellectual property and the sales of its patent-protected products, including Eylea. Id.; Clark Decl. ¶ 19. For its part, Celltrion contends this factor counsels against an injunction because the public has an interest in access to lower-cost aflibercept products. Opp. 25.

The Court finds the public interest factor favors entry of an injunction. Intellectual property rights promote innovation across a number of fields, including pharmaceuticals. The Court finds there exists a public interest in protecting such rights and encouraging this innovation. Sanofi-Synthelabo, 470 F.3d at 1383-84; Hybritech, 849 F.2d at 1458; Patlex Corp., 758 F.2d at 599. For the reasons discussed above, the Court has found Regeneron is likely to demonstrate Celltrion's sales of CT-P42 would infringe the Asserted Product Patent Claims and that such claims are likely valid. The public has an interest in safeguarding these patent rights.

Celltrion does not identify any interest the public may have in accessing its aflibercept biosimilar beyond a general interest in access to lower-cost drug products. Opp. 25. The Court finds such interest is outweighed by the compelling interest in fostering pharmaceutical innovation. In reaching this conclusion, the Court

** SEALED **

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

finds itself in company with most of courts that have considered this issue, including the Federal Circuit.  See, e.g., Hybritech, 849 F.2d at 1458; Douglas Dynamics v. Buyers Prods.,717 F.3d 1336, 1346 (Fed. Cir. 2013) ("[T]he public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying 'cheaper knock-offs.'").

The Court recognizes the apparent tension between traditional patent law concepts and the BPCIA, particularly as it pertains to the public interest factor.  Of course, "the public has a well-recognized interest in protecting patent rights and fostering innovation," Apple, 809 F. 3d at 647, but Congress also has enacted significant legislation, the BPCIA, that is designed to foster competition and make alternative and lower-cost therapeutics available to patients, and Courts have expressly found in the BPCIA biosimilar context that "[f]or pharmaceutical drugs that prolong and save lives, there is a critical public interest in affordable access to those drugs," Genentech, Inc. v. Immunex Rhode Island Corp., 395 F. Supp. 3d 357, 366 n.6 (D. Del. 2019), aff'd, 964 F.3d 1109 (Fed. Cir. 2020); see also Janssen Biotech, Inc. v. Celltrion Healthcare Co., 210 F. Supp. 3d 244, 252 (D. Mass. 2016) (recognizing a strong public interest in "[a] less expensive biosimilar alternative to compete fairly with [the reference

IN RE: AFLIBERCEPT PATENT LITIGATION795                          1:24-MD-3103

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

product]"). Nonetheless, after considering the applicable authority, even if not squarely within BPCIA's umbrella, the Court ultimately concludes that the public interest factor also weighs in favor of permanent injunctive relief here.

## VI.   CONCLUSION

Upon consideration of Plaintiff's Motion for Preliminary Injunction, accompanying Memorandum in Support, exhibits attached thereto, and all of the evidence presented before this Court, for the reasons set forth below, it is **ORDERED THAT:**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff's Motion for a Preliminary Injunction [ECF No. 108, 131] is **GRANTED**. Celltrion's Emergency Motion to Strike or in the alternative to file a sur-reply [ECF No. 160-2] is **DENIED** to the extent it seeks to strike the reply or the Graham Declaration. It is **GRANTED** to the extent it seeks to file a sur-reply.

Pursuant to Federal Rule of Civil Procedure 65(d)(1), and for the reasons provided herein, the Court makes the following findings and conclusions based upon the preliminary record developed in connection with Regeneron's motion.

1. Defendant Celltrion, Inc. ("Celltrion") has sought FDA approval via its Biologics License Application No. 761377 to market a biosimilar version of Regeneron's drug EYLEA©. Celltrion's

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

product that is the subject of this BLA is also known as "CT-P42."

2.    Regeneron has demonstrated that it is likely to succeed in proving that the CT-P42 formulation described in BLA No. 761377 infringes claims 4, 7, 9, 11, 14-17, 29, 32, 34, 36, and 39-42 of U.S. Patent No. 11,084,865 (the '865 Patent).

3.    Celltrion has not demonstrated that there is a substantial question about the validity of the infringed claims of the '865 Patent.

4.    Regeneron has demonstrated that any manufacture, importation, or commercialization of CT-P42 prior to the expiry of the '865 patent will cause it irreparable harm.

5.    Regeneron has demonstrated that the balance of hardships favors Regeneron, not Celltrion.

6.    Regeneron has demonstrated that the public interest favors granting the preliminary injunction in order to protect intellectual property rights and because the public is already able to receive aflibercept therapy in the form of EYLEA©.

7.    Regeneron has demonstrated that there is a reasonable probability of ultimate success upon the question of personal jurisdiction when the action against Celltrion is tried on the merits.

IN RE: AFLIBERCEPT PATENT LITIGATION797                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

### A.   Scope of Injunction and Meet-and-Confer Requirement

The Court is mindful that there are complexities associated with the multi-jurisdiction manufacture of Defendant's product for markets outside the United States — markets which are beyond the territorial reach of U.S. patent laws.  Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454-55 (2007) ("The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law.").  In order to ensure that the injunction entered by this Court does not ensnare activity that it is not meant to ensnare, and does not disrupt activities directed to non-U.S. markets, **the Court hereby orders the parties to meet and confer regarding the conditions and scope of the injunction and jointly submit to the Court a proposed form of injunction order within five (5) business days of entry of this order**.  The Court further finds that because the only harm that Regeneron presented in the record of these injunction proceedings is directed to commercial marketing within the U.S., the proposed form of injunction should likewise be restricted to prohibiting the commercial sale to customers in the U.S. of Celltrion products subject to the BLA No. 761377 product.

### B.   Meet-and-Confer on Public Order

The Court is filing this Order under seal, as the Court

** SEALED **

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

understands that there is information herein that the parties have designated Confidential or Outside Counsel Eyes Only under the Protective Order.  The Court expects the parties to confer on preparing and submitting a public version containing appropriate redactions to protect each party's confidential information.  The parties shall meet and confer to discuss which portions of this Order can be unsealed.  **They shall submit a joint proposed redacted version for the Court's review within seven (7) days of the entry of this Order.**

C.   Rule 65(c) Security

Pursuant to Rule 65(c), the Court must require sufficient security from Plaintiff in an amount the Court considers proper to pay the costs and damages sustained by any wrongfully enjoined party.  **The parties are hereby ordered to meet and confer regarding an appropriate security amount and form within five (5) days of entry of this Order.  They shall thereafter submit a joint proposed order establishing security under Rule 65(c).  If no joint proposal is feasible after good faith joint efforts, each party shall submit their own proposal with supporting evidence for the Court's consideration and a proposed order effectuating same within ten (10) days of entry of this order.**

It is so **ORDERED.**

**\*\* SEALED \*\***

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

The Clerk is **DIRECTED** to transmit copies of this Order **only**

to counsel for Regeneron and Celltrion in case 1:23-CV-89.

DATED: June 28, 2024

_Tom S Kleeh_

THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA